Charles F. Hinkle, OSB No. 71083
cfhinkle@stoel.com
Brad S. Daniels, OSB No. 02517
bsdaniels@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

      Attorneys for Defendants Tom Martino and Westwood One, Inc.


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| JOHN M. GARDNER and SUSAN L. GARDNER, husband and wife, and MT. HOOD POLARIS, INC., an Oregon corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>TOM MARTINO, dba *THE TOM MARTINO SHOW*, WESTWOOD ONE, INC., a Delaware corporation, and CLEAR CHANNEL COMMUNICATIONS, INC., a Texas corporation,<br><br>        Defendants. | Civil No. 3:05-CV-769-HU<br><br>MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION) |


MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................................. 1

III.  STATUTORY BASIS FOR MOTION............................................................................... 5

IV.   ARGUMENT........................................................................................................................ 7

      A.    Plaintiffs' Claims Arise Out of Conduct Described in ORS 31.150(2)................. 7

            1.    Martino's Statements Were Made In the Exercise of his
                  Constitutional Right of Free Speech.......................................................... 7

            2.    Martino's Statements Related to "An Issue of Public Interest."............... 7

      B.    Plaintiffs Have the Burden of Showing a Probability that They Will
            Prevail ..................................................................................................................... 14

            1.    The Defamation Claim............................................................................ 14

                  a.    In Context, Martino's Statement, "They're Just Lying," Is
                        A Non-Actionable Statement of Opinion, As a Matter of
                        Common Law and As a Matter of First Amendment Law .......... 17

                  b.    Martino's Alleged Characterization of Plaintiffs As
                        "Irresponsible and Unresponsive to Their Customers" Is a
                        Nonactionable Statement of Opinion........................................... 26

                  c.    Martino's Statement that "These People Truly Suck" Is Not
                        an Actionable Statement of Fact.................................................. 28

                  d.    If the Defamation Claim Is Not Stricken Entirely, Then
                        Susan Gardner's Defamation Claim Should Be Stricken,
                        Because None of the Alleged Statements Were "About"
                        Her............................................................................................... 30

            2.    The False Light Claim ............................................................................ 31

                  a.    The False Light Claim Should Be Stricken in Its Entirety,
                        For the Same Reason that the Defamation Claim Should Be
                        Stricken ....................................................................................... 31

                  b.    The False Light Claim Should Be Stricken for the
                        Independent Reason that Plaintiffs Cannot Show Actual
                        Malice .......................................................................................... 32

                  c.    If the False Light Claims Are Not Stricken In Their
                        Entirety, Then the False Light Claim of Mt. Hood Polaris
                        Should Be Stricken, Because a Corporation Has No Right
                        of Privacy..................................................................................... 34

|  | d. | If the False Light Claims Are Not Stricken In Their Entirety, Then the False Light Claim of Susan Gardner Should Be Stricken, Because None of the Statements in the Broadcast were "Of and Concerning" Her .................................. 34 |

3.     The Intentional Interference Claims ......................................................... 35

4.     If Plaintiffs' Claims Are Not Stricken In Their Entirety, Then Their Claims for Lost Profits and Lost Sales Should Be Stricken, Because They Cannot Prove Causation .................................................... 36

V.     CONCLUSION ................................................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Hall,*
328 Or. 276, 974 P.2d 199 (1999) .................................................................................... 35, 37

*Card v. Pipes,*
Civil No. 03-6327-HO ........................................................................................................ 6, 10

*Cochran v. NYP Holdings, Inc.,*
58 F.Supp.2d 1113 (C.D. Cal.1998),
*aff'd,* 210 F.3d 1036 (9th Cir. 2000)....................................................................................... 25

*ComputerXpress, Inc. v. Jackson,*
113 Cal. Rptr.2d 625 (Cal. App. 2001)............................................................................. 14, 30

*Cort v. St. Paul Fire & Marine Ins. Cos., Inc.,*
311 F.3d 979 (9th Cir. 2002) .................................................................................................. 32

*Dean v. Guard Pub. Co., Inc.,*
73 Or. App. 656, 699 P.2d 1158 (1985)................................................................................. 33

*DeLashmitt v. Journal Pub. Co.,*
166 Or. 650, 114 P.2d 1018 (1941) ....................................................................................... 37

*Dodds v. American Broadcasting Co.,*
145 F.3d 1053 (9th Cir. 1998) .................................................................................... 26, 33, 34

*Doherty v. Hazelwood Co.,*
90 Or. 475, 177 P. 432 (1919) ............................................................................................... 36

*DuPont Merck Pharmaceutical Co. v. Superior Court,*
92 Cal.Rptr.2d 755 (Cal. App. 2000)...................................................................................... 13

*Eberhardt v. Morgan Stanley Dean Witter Trust FSB,*
2001 WL 111024 (N.D. Ill. 2001) .......................................................................................... 34

*Faltas v. State Newspaper,*
928 F.Supp. 637 (D. S.C. 1996),.................................................................................... 18, 38

*Flowers v. Clinton,*
310 F.3d 1118 (9th Cir. 2002) ............................................................................................... 33

*Gill v. Delaware Park, LLC,*
294 F. Supp.2d 638 (D. Del. 2003)................................................................................... 17, 22

*Gill v. Hearst Pub. Co.,*
253 P.2d 441 (Cal. 1953)........................................................................................................ 11

*Gorman v. Swaggart,*
524 So.2d 915 (La. App. 1988)............................................................................................... 34

*Haas v. Painter,*
62 Or. App. 719, 662 P.2d 768, *review denied* 295 Or. 297, 668 P.2d 381
(1983)....................................................................................................................................... 17

*Hamilton v. Crown Life Ins.,*
246 Or. 1, 423 P.2d 771 (1967) .............................................................................................. 11

*Hickey v. Settlemier*,
 141 Or. App. 103, 917 P.2d 44, *review denied*, 323 Or. 690, 920 P.2d 549
 (1996). ........................................................................................................................... 30

*Huggins v. Moore*,
 726 N.E.2d 456 (N.Y. 1999) ........................................................................................ 11

*Ingels v. Westwood One Broadcasting Services, Inc.*,
 28 Cal.Rptr.2d 933 (Cal. App. 2005) ............................................................................ 7

*Ingels v. Westwood One Broadcasting Services, Inc.*,
 28 Cal.Rptr.3d 933 (Cal. App. 2005) ............................................................................ 6

*Kilgore v. Koen*,
 133 Or. 1, 288 P. 192 (1930) ................................................................................. 15, 19

*King v. Menolascino*,
 276 Or. 501, 555 P.2d 442 (1976) .............................................................................. 17

*Knievel v. ESPN*,
 393 F.3d 1068 (9th Cir. 2005) .......................................................... 16, 17, 23, 25, 29

*Koch v. Goldway*,
 817 F.2d 507 (9th Cir. 1987) ...................................................................................... 29

*Kurdock v. Electro Scientific Industries, Inc.*,
 Multnomah County Circuit Court No. 0406-05889 ....................................................... 9

*L. Cohen & Co. v. Dun & Bradstreet, Inc.*,
 629 F. Supp. 1425 (D. Conn. 1986) ............................................................................ 34

*Lieberman v. Fieger*,
 338 F.3d 1976 (9th Cir. 2003) .................................................................................... 30

*Lohrenz v. Donnelly*,
 223 F.Supp.2d 25 (D. D.C. 2002) ............................................................................... 35

*Ludwig v. Superior Court*,
 43 Cal.Rptr.2d 350 (Cal. App. 1995) ............................................................................ 6

*Mann v. Quality Old Time Service, Inc.*,
 15 Cal.Rptr.3d 215 (Cal. App. 2004) ............................................................................ 6

*Marleau v. Truck Ins. Exchange*,
 333 Or. 82, 37 P.3d 148 (2001) .................................................................................. 32

*Marr v. Putnam*,
 196 Or. 1, 246 P.2d 509 (1952) ............................................................................ 15, 19

*Masson v. New Yorker Magazine*,
 501 U.S. 496, 111 S. Ct. 2419, 115 L.Ed.2d 447 (1991) ........................................... 28

*McNabb v. Oregonian Publishing Co.*,
 69 Or. App. 136, 685 P.2d 458, *rev. denied* 297 Or. 824, 687 P.2d 797 (1984),
 *cert. denied* 469 U.S. 1216, 105 S. Ct. 1193, 84 L.Ed.2d 339 (1985) ..................... 33

*Melaleuca, Inc. v. Clark*,
 78 Cal.Rptr.2d 627 (Cal. App. 1998) .......................................................................... 13

*Metabolife Intern., Inc. v. Wornick*,
 264 F.3d 832 (9th Cir. 2001) ........................................................................................ 1

Page iv  -    MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
              SLAPP MOTION)

*Muzikowski v. Paramount Pictures Corp.*,
322 F.3d 918 (7th Cir. 2003) ............................................................................................... 34

*O'Connor v. Zeldin*,
134 Or. App. 444, 895 P.2d 809 (1995)............................................................................... 12

*Ollman v. Evans*,
750 F.2d 970 (D.C. Cir. 1984)............................................................................................. 16

*Owens v. Maass*,
323 Or. 430, 918 P.2d 808 (1996) ....................................................................................... 10

*Paradise Hills Associates v. Procel*,
235 Cal.App.3d 1528, 1 Cal.Rptr.2d 514 (1991).................................................................. 13

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) .................................................................................. 16, 26, 32,

*PGE v. Bureau of Labor and Industries*,
317 Or. 606, 859 P.2d 1143 (1993) ........................................................................................ 9

*Phantom Touring, Inc. v. Affiliated Publications*,
953 F.2d 724 (1st Cir. 1992)........................................................................................... 16, 29

*Rajneesh Foundation v. McGreer*,
303 Or. 371, 737 P.2d 593 (1987) ....................................................................................... 17

*Reesman v. Highfill*,
327 Or. 597, 965 P.2d 1030 (1998) ..................................................................................... 32

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002)................................................................................................ 24

*Seelig v. Infinity Broadcasting Corp.*,
119 Cal.Rptr.2d 108 (Cal. App. 2002)......................................................................... 6, 7, 12

*Simpson v. Burrows*,
90 F.Supp.2d 1108 (D. Or. 2000) ..................................................................... 15, 29, 31, 37

*Sipple v. Foundation for Nat. Progress*,
83 Cal. Rptr.2d 677 (Cal. App. 1999).................................................................................... 5

*Solano v. Playgirl, Inc.*,
292 F.3d 1078 (9th Cir. 2002) ............................................................................................. 14

*Southern Air Transp. v. American Broad. Cos.*,
670 F. Supp. 38 (D. D.C. 1987), *aff'd*, 877 F.2d 1010 (D.C. Cir. 1989).............................. 34

*St. Amant v. Thompson*,
390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)..................................................... 33, 34

*Standing Comm. on Discipline of the United States Dist. Court v. Yagman*,
55 F.3d 1430 (9th Cir. 1995) .......................................................................................... 26, 30

*Steinhilber v. Alphonse*,
501 N.E.2d 550 (N.Y. 1986)................................................................................................ 29

*Stevens v. Tillman*,
855 F.2d 394 (7th Cir. 1988) ............................................................................................... 29

*Thale v. Business Journal Publications*,
Mutlnomah County Circuit Court No. 0402-02160.................................................................. 9

Page v  -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

*Thomas v. Fry's Electronics, Inc.*,
 400 F.3d 1206 (9th Cir. 2005) ................................................................................................ 6

*Time, Inc. v. Hill*,
 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) ............................................................. 32

*Traditional Cat Assn., Inc. v. Gilbreath*,
 13 Cal.Rptr.3d 353 (Cal. App. 2004) ..................................................................................... 12

*Troy Group, Inc. v. Tilson*,
 364 F.Supp.2d 1149 (C.D. Cal. 2005) .................................................................................... 22

*Underwager v. Channel 9 Australia*,
 69 F.3d 361 (9th Cir. 1995) .............................................................................. 16, 23, 24, 25

*United States v. Morton Salt Co.*,
 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950) ................................................................. 34

*Vess v. Ciba-Geigy Corp. USA*,
 317 F.3d 1097 (9th Cir. 2003) ........................................................................................... 6, 39

*Washington v. Smith*,
 80 F.3d 555 (D.C. Cir. 1996) ........................................................................................ 11, 16

*Wilbanks v. Wolk*,
 17 Cal. Rptr.3d 497 (Cal. App. 2004) .................................................................................... 12

**Rules and Statutes**

Or. Laws 2001, chapter 616 ......................................................................................................... 5

*Former* ORS 18.560(2)(b) (renumbered ORS 31.710(2)(b)) ....................................................... 37

ORS 31.150 to 31.155 ............................................................*passim*; quoted in material part at 5

**Other Authorities**

Komanoff, Charles and Howard Shaw, "Drowning in Noise: Noise Costs of Jet
 Skis in America," Noise Pollution Clearinghouse, April 2000,
 http://www.nonoise.org/library/drowning/execsum.htm ........................................................ 2

Restatement (Second) of Torts, § 652E ...................................................................................... 33

Restatement (Second) of Torts, § 652I ....................................................................................... 34

Testimony of Dave Heynderickx to Oregon House of Representatives Committee ............... 6, 12

Webster's Third International Dictionary .................................................................................... 11

## I.    INTRODUCTION

Defendants Tom Martino ("Martino") and Westwood One, Inc. ("Westwood") submit this memorandum in support of their "special motion to strike," filed pursuant to Oregon's anti-SLAPP statute, ORS 31.150 to 31.155.[1]  Defendants Martino and Westwood have moved to strike plaintiff's claims against them, on the ground that those claims are based solely on statements made by defendants in furtherance of their constitutional right of free speech in connection with an issue of public interest.

## II.    STATEMENT OF FACTS

Plaintiffs John and Susan Gardner own plaintiff Mt. Hood Polaris, Inc., which sells water craft. (Complaint, ¶¶ 2, 8.) Defendant Martino is the host of a syndicated radio talk show, *The Tom Martino Show*, which is broadcast Monday through Friday on radio stations around the United States, including KEX in Portland. (*Id.*, ¶ 3.) Westwood distributes *The Tom Martino Show* to local radio stations. (*Id.*, ¶ 4.) Plaintiffs' complaint alleges claims for false light invasion of privacy, defamation, and intentional interference with economic relationships, all based on statements made by Tom Martino during a radio broadcast in November 2004.

The format of *The Tom Martino Show* includes telephone conversations between Martino and individuals who call the show to discuss problems they have had with products or services that they have purchased. Plaintiffs' claims in this case arise out of a conversation between Martino and a woman identified on the air as "Melissa," relating to problems that she had had with a personal water craft ("PWC") that she had bought from Mt. Hood Polaris. As the Feroglia Declaration shows, Melissa Feroglia was the caller to whom Martino spoke. A transcript of the portion of the show relating to Feroglia and her problems with the PWC is attached to the

---

[1] "'Anti-SLAPP' stands for 'Anti-Strategic Lawsuit Against Public Participation.'" *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 837 n. 7 (9th Cir. 2001).

Page 1  -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

Feroglia Declaration as Exhibit 2. A computer disk with an audio recording of the show is attached to the Hinkle Declaration as Exhibit 9. (See Hinkle Decl., ¶ 6.)

Martino began his on-air conversation with Feroglia by asking her, "why are you unhappy with this jet ski?"[2] Feroglia responded: "Well, I've owned it for four and a half months, and it's only run for 25 hours." She described the problems that she had had with the jet ski, and with the dealer from whom she bought it – namely, Mt. Hood Polaris. She said her jet ski had had "multiple over-heating problems," that she took it to the dealer in July, that the dealer put a new engine in it after only 18 hours of use, and that the new engine broke down during the Labor Day weekend. Feroglia said she took the jet ski back to the dealer and:

> "They've had it since September 8th. The dealer told me he was taking it back, that it was too much trouble for him to work on, and in his opinion it was a bad machine. He wrote out an invoice saying that it was a buy back, and now they are not honoring that."

Martino then asked: "So you don't have anything? You don't have your money or your machine?" Feroglia responded: "No." Martino: "Will he give your machine back?" Feroglia: "He will. He says that they think they've corrected the problem. They took an intake valve that brings water in to cool it and drilled it out to make it bigger to see if that would help. It's not a new part, they just stuck a drill in it."

Martino then asked Feroglia, "Why don't they, why don't they go out and try it?" Feroglia responded: "Well, on the 8th when I called and asked why it hadn't been tried, they

---

[2] In popular usage, the vehicle that Feroglia purchased is often referred to as a "jet ski." "Jet Ski" is a registered trademark of Kawasaki Motors Corp., but the term "jet ski" is often used to denote a generic class of personal water craft. *See* Charles Komanoff and Howard Shaw, "Drowning in Noise: Noise Costs of Jet Skis in America," Noise Pollution Clearinghouse, April 2000, http://www.nonoise.org/library/drowning/execsum.htm (visited June 29, 2005). The PWC that Feroglia bought was manufactured by Polaris Industries, not by Kawasaki.

Page 2  -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

said, all of a sudden they called me back two hours later and said, oh, we did try it, it works great." Martino then said: "Yeah, they're just, yeah, they're just lying to you." Feroglia responded: "Right, 'cause now it's November in Washington and I can't ride it to find out."

Martino then said, "But you have something in writing that says a buy back." Feroglia responded: "No, he put it in writing, and I asked for a copy. He said I didn't need it. However, I do have the senior shop technician verifying that he had the buy back order and was told not to work on the boat."

Martino: "You actually have, what do you mean you have him? He'll admit it?"

Feroglia: "He did admit it to me on …."

Martino: "No, but will he admit it to us? Will they admit to us that they … they went back on their word?" (In that sentence, Martino started to say a word that began with the letter "L", but he did not say the word.) Feroglia responded: "I don't know, they might."

Martino then said "No, they're gonna say they never said it. Okay, we'll call them because I think—and I want this to work—but I think they're going to tell us, no, they're going to say, no, we never promised this. I mean, we'll ask them." Martino's assistant on the radio show, a man named Chris, then said "I did put a call into them. There was no answer. I'll keep trying." Martino: "What's the name of the place, Chris?" Chris: "It's Polaris Industries at Mt. Hood Polaris." Martino: "Oh, so you didn't call the dealer?" Chris: "No, we called, this is the dealer, right?" Martino: "I don't know. It sounds to me like the manufacturer. But find out off the air. I want to call the dealer who promised to buy, who promised to buy it back."

The show then went to a commercial break, and when Martino returned from the break, he spoke with other callers on other subjects. Approximately 45 minutes later, Martino returned

Page 3   -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

to the jet ski issue. He began by saying "I'm going to say this: Polaris sucks," and then

described the situation as follows:

> "We called the dealer. This woman has a Polaris jet ski that was
> overheating. She only used it 25 hours the whole season. Now it's
> November in Washington, so guess what happens. The dealer tries
> to fix it. They even put in a new engine. So I'll give it to the
> dealer, they tried. This woman says it overheats every single time
> she takes it out. She thinks it's a design flaw. She claims the
> dealer offered to buy it back then changed his mind. So, we called
> the dealer. The dealer says that there's nothing we can do for her.
> We're not going to talk about it. She needs to go to the
> manufacturer. So we called the manufacturer—Polaris Industries.
> They said she has to go through the dealer. Now listen carefully.
> She has to go through the dealer. The dealer says she has to go
> through the manufacturer. Mt. Hood Polaris, Polaris Industries
> equals Polaris sucks. Here's your equation. Polaris Industries plus
> Mt. Hood Polaris equals sucks. Why? Because she has nowhere
> to go. Ping, pong. [clicking noises] Polaris Industries, Mt. Hood
> Polaris. I urge you to let them know you will never buy a Polaris
> product knowing they treat people like this. This is a real case.
> Okay. This is a real case. Polaris Industries did not say, we will
> look into it. They wouldn't even have the courtesy, they wouldn't
> even extend her the courtesy to look into it. They simply said she
> must call the dealer. The dealer says, she must call the
> manufacturer. How can you possibly run a business like that.
> How can you? I urge her to sue. I urge you to let Mt. Hood
> Polaris in Washington know about this. Chris, I need the numbers
> to these places. I need them now."

After some further colloquy between Martino and Chris, they announced the telephone

numbers for both the dealer, Mt. Hood Polaris, and the manufacturer, Polaris Industries. Martino

then said, "Polaris Industries says she has to go to the dealer. The dealer says she has to go to

Polaris," followed by the telephone number for Polaris Industries, but not the number for Mt.

Hood Polaris. That concluded the segment of the program relating to Feroglia's PWC.

Page 4  -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

## III. STATUTORY BASIS FOR MOTION

ORS 31.150 provides, in part, as follows:

"(1) A defendant may make a special motion to strike against a claim in a civil action described in subsection (2) of this section. The court shall grant the motion unless the plaintiff establishes in the manner provided by subsection (3) of this section that there is a probability that the plaintiff will prevail on the claim. The special motion to strike shall be treated as a motion to dismiss under ORCP 21 A but shall not be subject to ORCP 21 F. Upon granting the special motion to strike, the court shall enter a judgment of dismissal without prejudice.

"(2) A special motion to strike may be made under this section against any claim in a civil action that arises out of:

\*\*\*\*\*

"(d) Any other conduct in furtherance of the exercise of \*\*\* the constitutional right of free speech in connection with a public issue or an issue of public interest.

"(3) A defendant making a special motion to strike under the provisions of this section has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section. If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case. If the plaintiff meets this burden, the court shall deny the motion.

"(4) In making a determination under subsection (1) of this section, the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

This statute was adopted by the legislature in 2001. Or. Laws 2001, ch. 616. California

adopted its anti-SLAPP statute in 1992 (*see Sipple v. Foundation for Nat. Progress*, 83 Cal.

Rptr.2d 677, 682 (Cal. App. 1999)), and Oregon's statute was "closely modeled on the California

Page 5 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

statute." (Testimony of Dave Heynderickx, Legislative Counsel, to House Committee on Judiciary, Subcommittee on Civil Law, March 19, 2001; Hinkle Declaration, Ex. 1.)

"California anti-SLAPP motions to strike and entitlement to fees and costs are available to litigants proceeding in federal court ***." *Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206, 1206 (9th Cir. 2005). Oregon anti-SLAPP motions may similarly be made in federal court cases, including cases removed to this court from Oregon state court. *Card v. Pipes*, Civil No. 03-6327-HO (opinion dated March 1, 2004). (A copy of Judge Hogan's opinion is attached as Exhibit 2 to the Hinkle Declaration.)

"California's anti-SLAPP statute was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003). However, "[t]he moving defendant has no obligation to demonstrate that the plaintiff's subjective intent was to chill the exercise of constitutional speech or partition rights, or that the action had the effect of chilling such rights." *Mann v. Quality Old Time Service, Inc.*, 15 Cal.Rptr.3d 215, 220 (Cal. App. 2004).

The statute can be invoked against any kind of claim that is based on protected speech. "The nature of the cause of action alleged is not dispositive." *Ingels v. Westwood One Broadcasting Services, Inc.*, 28 Cal.Rptr.3d 933, 940 (Cal. App. 2005) (applying statute to age discrimination claim). *See also Seelig v. Infinity Broadcasting Corp.*, 119 Cal.Rptr.2d 108 (Cal. App. 2002) (applying statute to claims for intentional infliction of emotional distress, slander, and invasion of privacy); *Ludwig v. Superior Court*, 43 Cal.Rptr.2d 350 (Cal. App. 1995) (applying statute to claims for interference with contractual relations, interference with prospective economic advantage, and unfair competition).

Page 6  -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

## IV.    ARGUMENT

### A.    Plaintiffs' Claims Arise Out of Conduct Described in ORS 31.150(2).

Under ORS 31.150(3), a court must first decide whether a claim "arises out of a statement, document or conduct described in subsection (2) of this section." In this case, plaintiffs' complaint is based on statements made "in furtherance of the exercise of the constitutional right of *** of free speech in connection with a public issue or an issue of public interest" within the meaning of ORS 31.150(2)(d).

### 1.    Martino's Statements Were Made In the Exercise of his Constitutional Right of Free Speech.

Plaintiffs' claims are based solely on statements made by defendant Martino during a radio talk show. A broadcast conversation between a radio talk show host and a listener is "conduct in furtherance of the exercise of *** the constitutional right of free speech," within the meaning of ORS 31.150(2)(d). At least two California appellate decisions have applied the California statute to on-air conversations on a radio talk show. *Ingels v. Westwood One Broadcasting Services, Inc.*, 28 Cal.Rptr.2d 933 (Cal. App. 2005); *Seelig v. Infinity Broadcasting Corp.*, 119 Cal.Rptr.2d 108 (Cal. App. 2002).

### 2.    Martino's Statements Related to "An Issue of Public Interest."

The subject of discussion between Feroglia and Martino during the radio broadcast of November 11, 2004, was Feroglia's unhappy experience with the PWC that she had bought from Mt. Hood Polaris on June 16, 2004. Feroglia had kept a diary of her experiences with the PWC, and by November 8, 2004, which was 145 days after she bought it, the PWC had been in Mt. Hood Polaris's shop for repairs for 100 days. (Diary at 6; Feroglia Decl., Ex. 1.) The dealer was unable to fix the problem, and the dealer had not followed through on its promise to buy back the vehicle from Feroglia. As Feroglia said to Martino, "He wrote out an invoice saying that it was a

Page 7   -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

buy back, and now they are not honoring that." (Transcript at 2; Feroglia Decl., Ex. 2.) That promise had been made on September 8; two months later, Feroglia had still not received a refund, and the PWC had been in the shop at Mt. Hood Polaris for that entire period.

Feroglia had received inconsistent and contradictory messages from the dealer and the manufacturer about their respective responsibilities for resolving the problems. As her Declaration shows, the dealer, John Gardner, had repeatedly failed to return her phone calls and had repeatedly failed to call her when he promised to do so. (Feroglia Decl., ¶¶ 14-19, 34-25, 27-29.) After weeks of getting no satisfactory response from the dealer or the manufacturer either about getting her PWC back in a fully operational condition or about getting a refund of her purchase price, Feroglia telephoned *The Tom Martino Show* to talk about her experience. Feroglia had been a listener to *The Tom Martino Show*, and she knew that Martino held himself out to be a consumer advocate who helps consumer resolve their complaints about unsatisfactory merchandise or service. Martino refers to himself on the show as "the Troubleshooter," and his Internet website[3] contains the following descriptions:

> "Tom Martino has been fighting for consumers more than 25 years in radio, television and newspapers. He is known as 'The Troubleshooter' by millions of loyal fans! His dynamic action-packed radio show can be heard on radio stations across America – syndicated by Westwood One. The show originates from Tom's flagship station KHOW in Denver.
>
> "The show is the hottest thing on radio and Tom invented the format! On every show he blasts liars and cheaters, exposes rip-offs and investigates consumer complaints live on the air."

The subject matter of *The Tom Martino Show* in general and of the conversation between Feroglia and Martino in particular clearly relates to "an issue of public interest," within the

---

[3] http://www.troubleshooter.com/

Page 8  -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

meaning of that phrase in ORS 31.150(2)(d). That phrase is not defined in the statute, but words of common usage in a statute are to be interpreted according to "their plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or. 606, 611, 859 P.2d 1143, 1146 (1993). Consistent with the plain meaning of the words, courts have construed the "public interest" standard very broadly.

There is no reported decision of an Oregon appellate court construing the anti-SLAPP statute, but there are at least two Oregon state trial court decisions applying it. In *Thale v. Business Journal Publication*s, Multnomah County Circuit Court No. 0402-02160, the plaintiff was the former Director of Corporate Marketing for InFocus Corporation. (Thale Complaint, ¶ 6.) She sued the *Business Journal* for libel and false light invasion of privacy, based on statements it had published in an article about InFocus, relating to the circumstances surrounding her resignation from that company. (*Id.*, ¶¶ 8, 9.) The *Business Journal* filed a motion to strike the complaint under ORS 31.150, contending that its statements about the plaintiff's resignation were statements made on "an issue of public interest." Judge Fuchs agreed. She granted the motion to strike, and entered an Order dated May 26, 2004, holding that the publication of the statements about Thale "constituted conduct in furtherance of the constitutional right of free speech in connection with an issue of public interest, within the meaning of ORS 31.150(2)(d)."[4]

In *Kurdock v. Electro Scientific Industries, Inc.*, Multnomah County Circuit Court No. 0406-05889, the plaintiff sued the defendant after it fired him. His complaint included claims for defamation and intentional infliction of emotional distress ("IIED"), based on statements that the company had made to other employees and to its shareholders concerning his termination. His

---

[4] Copies of the complaint, the court's Order granting the "special motion to strike" under ORS 31.150, and the judgment in the *Thale* case are attached as Exhibits 3, 4, and 5 to the Hinkle Declaration.

Page 9 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

termination coincided with an investigation of financial irregularities at the company (Kurdock

Complaint, ¶¶ 17-45), and the plaintiff alleged that the company's statements implied that "his

firing was related to the investigation." (*Id.*, ¶ 45.) The company filed a motion to strike the

defamation and IIED claims under ORS 31.150, contending that its statements about the

plaintiff's termination were statements made on "an issue of public interest." Judge Wilson

agreed. In an order dated October 15, 2004, she dismissed the defamation and IIED claims

"because each claim is subject to ORS 31.150(c) and (d) [*sic*; should be ORS 31.150(2)(c) and

(d)] and plaintiff has not demonstrated a probability of prevailing on any of these claims."[5]

Judge Hogan's opinion in *Card v. Pipes*, *supra*, similarly illustrates the breadth of the

"public interest" standard in ORS 31.150. The plaintiff was a professor of Middle East studies at

the University of Oregon who sued the defendants for defamation based on statements published

in a newspaper and later on an Internet website, to the effect that the plaintiff had made anti-

Israel statements in the classroom. Judge Hogan held that "alleged political activism and bias in

the college classroom" was "an issue of public interest" within the meaning of the Oregon anti-

SLAPP statute. (Order at 17 (Hinkle Decl., Ex. 2.)

The broad meaning given to the phrase "issue of public interest" by Judge Fuchs, Judge

Wilson, and Judge Hogan is consistent with the long-standing rule in Oregon that "the court

presumes that the legislature enacts statutes in the light of existing judicial decisions that have a

direct bearing upon those statutes." *Owens v. Maass*, 323 Or. 430, 438, 918 P.2d 808, 813

(1996). When the Oregon legislature used the term "issue of public interest" in the anti-SLAPP

statute in 2001, it was not writing on a blank slate. That concept had been the subject of many

---

[5] Copies of the complaint, the court's order granting the defendant's Special Motion to
Strike under the anti-SLAPP statute, and the stipulated judgment of dismissal in the *Kurdock*
case are attached as Exhibits 6, 7, and 8 to the Hinkle Declaration.

Page 10 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

court decisions prior to the enactment of Oregon's statute, often in the context of libel and privacy claims similar to those asserted by plaintiffs here. In *Huggins v. Moore*, 726 N.E.2d 456 (N.Y. 1999), for example, the court held, in a libel case, that economic spousal abuse was a matter of "genuine social concern," *id*. at 462, and that "a matter may be of public concern even though it is a 'human interest' portrayal of events in the lives of persons who are not themselves public figures, so long as some theme of legitimate public concern can reasonably be drawn from their experience." *Id*. at 460-61. *Accord, Gill v. Hearst Pub. Co*., 253 P.2d 441, 444 (Cal. 1953) (privacy case; photograph of couple in "romantic pose" at Los Angeles Farmers Market had "no particular news value" but was nevertheless "a matter of legitimate public interest" because it was "designed to serve the function of entertainment"); *Washington v. Smith*, 80 F.3d 555, 556-57 (D.C. Cir. 1996) (libel case; success of the University of Kansas women's basketball team was "a matter of public concern").

The Oregon Supreme Court had applied the "public interest" concept in an equally broad manner well before the Oregon legislature used that term in the anti-SLAPP statute. In *Hamilton v. Crown Life Ins*., 246 Or. 1, 5, 423 P.2d 771, 773 (1967), the Court held that a private person's suicide was "newsworthy" and that the decedent's widow had no actionable claim for invasion of privacy based on defendant's dissemination of information about the suicide. "Newsworthy" means "sufficiently interesting to a general public to warrant reporting in the news," *Webster's Third New International Dictionary* 1524 (unabridged ed. 2002), and the *Hamilton* decision shows that in 2001, when the Oregon legislature adopted the anti-SLAPP statute, the scope of what constituted "an issue of public interest" for purposes of defamation, privacy, and related matters was very broad under Oregon law.

Page 11 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

Furthermore, as noted above, Oregon's anti-SLAPP statute was "closely modeled on the California statute,"[6] and "[w]hen a statute contains substantially the same terms as a statute from another jurisdiction, decisions construing that other statute may be persuasive." *O'Connor v. Zeldin*, 134 Or. App. 444, 447, 895 P.2d 809, 810 (1995). California courts have construed the "public interest" standard in the anti-SLAPP statute very broadly. In *Seelig v. Infinity Broadcasting Corp.*, *supra*, 119 Cal. Rptr. 2d 108, the subject of discussion on a radio talk show was a television program entitled "Who Wants to Marry a Multimillionaire." During the radio broadcast, the television program and the plaintiff's participation in it were ridiculed. When the plaintiff sued the talk show participants for slander, invasion of privacy, and other torts, the defendants filed a motion to strike under the California anti-SLAPP statute. The trial court denied the motion, and the defendants appealed. The Court of Appeal reversed, holding that the subject of the discussion – namely, a television show featuring "the sort of person willing to meet and marry a complete stranger on national television" – fell within the statutory criterion of "an issue of public interest." 119 Cal. Rptr. 2d at 115. *See also Traditional Cat Assn., Inc. v. Gilbreath*, 13 Cal.Rptr.3d 353, 356 (Cal. App. 2004) (statements concerning a dispute among different factions of cat breeders were matters of public interest for purposes of anti-SLAPP statute, because they "concerned matters of public interest in the cat breeding community").

Even more to the point, several California appellate decisions have held that statements about the quality of consumer goods and services are matters of public interest. In discussing the "public interest" standard in the anti-SLAPP statute, the court in *Wilbanks v. Wolk*, 17 Cal. Rptr.3d 497, 506-07 (Cal. App. 2004), said:

---

[6] Testimony of Dave Heynderickx, Legislative Counsel, to House Committee on Judiciary, Subcommittee on Civil Law, March 19, 2001; Hinkle Decl., Ex. 1.

Page 12 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

"Consumer information, however, at least when it affects a large
number of persons, also generally is viewed as information
concerning a matter of public interest. *Paradise Hills Associates v.
Procel* (1991) 235 Cal.App.3d 1528, 1 Cal.Rptr.2d 514, although
not itself [an anti-SLAPP] case, noted that the First Amendment
protected a consumer's statements about the quality of a seller's
products and service and her unhappiness with them, finding, in
part, that the statements concerned a matter of public interest.
'Courts have recognized the importance of the public's access to
consumer information. The growth of "consumerism" in the
United States is a matter of common knowledge. Members of the
public have recognized their roles as consumers and through
concerted activities, both private and public, have attempted to
improve their ... positions vis-à-vis the supplies [*sic*] and
manufacturers of consumer goods. They clearly have an interest in
matters which affect their roles as consumers, and peaceful
activities, such as plaintiffs', which inform them about such
matters are protected by the First Amendment.'" (Some internal
quotation marks and citations omitted.)

*Accord, DuPont Merck Pharmaceutical Co. v. Superior Court*, 92 Cal.Rptr.2d 755, 759 (Cal.

App. 2000) (for purposes of anti-SLAPP motion, statements comparing quality and effectiveness

of drug products were statements made "in connection with a public issue"); *Melaleuca, Inc. v.

Clark*, 78 Cal.Rptr.2d 627, 638 (Cal. App. 1998) (in context of claims for defamation and

economic interference, "statements about the contents of [plaintiff's] product were a matter of

public concern," and "the public has a well-recognized interest in knowing about the quality and

contents of consumer goods").

All of these authorities support the conclusion that statements made in the context of a

radio talk show devoted to consumer protection issues, relating to a consumer's problems with

the quality of a product and her attempts to get the product repaired or replaced, deal with "an

issue of public interest" within the meaning of ORS 31.150(2)(d).

Page 13 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
            SLAPP MOTION)

**B.     Plaintiffs Have the Burden of Showing a Probability that They Will Prevail.**

After a defendant makes "a prima facie showing that the claim against which the motion

is made arises out of a statement [relating to an issue of public interest]," "the burden shifts to

the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on

the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3).

"[T]he plaintiff 'cannot simply rely on the allegations in the complaint' \*\*\* but 'must provide

the court with sufficient evidence to permit the court to determine whether "there is a probability

that the plaintiff will prevail on the claim."'" *ComputerXpress, Inc. v. Jackson*, 113 Cal. Rptr.2d

625, 641 (Cal. App. 2001) (citations omitted).  Plaintiffs cannot meet that burden here.

### 1.     The Defamation Claim.

Plaintiffs' first claim is for false light invasion of privacy, and their second claim is for

defamation, but defendants will address the defamation claim first.  "'An action for invasion of

privacy by placing the plaintiff in a false light in the public eye is in substance equivalent to a

libel claim,'" *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1083 n. 2 (9th Cir. 2002) (citation

omitted), *cert. denied*, 537 U.S. 1029, 123 S.Ct. 557, 154 L.Ed.2d 443 (2002), and an analysis of

the reasons why plaintiffs cannot prevail on their defamation claim is equally relevant to their

privacy and intentional interference with economic relations claims.

The statements on which plaintiffs base all of their claims are described in paragraphs 10,

11, and 12 of the complaint (incorporated into their libel claim by paragraph 24), as follows:

Paragraph 10:

> "In the course of the broadcast, Martino characterized the Gardners
> and Mt. Hood Polaris as liars, as irresponsible and unresponsive to
> their customers, stated 'these people truly suck,' and otherwise
> painted plaintiffs in a false light."

Page 14 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
            SLAPP MOTION)

Paragraph 11:

> "In the broadcast, Martino made the following false and
> defamatory statement:
>
> "Martino: 'Why don't they go out and try it?'
>
> "Caller: 'Well, on the 8th when I called and asked why it hadn't
> been tried, they said – all of a sudden – called back, 2 hours later,
> and said, "Oh, we have tried it and it works great."'
>
> "Martino: "Yeah.  They are just – yeah they are just lying to you."

Paragraph 12:

> "In the broadcast, Martino posed the following question with false
> and defamatory implication. 'Will they admit to us they lied, they
> went back on their word?'"[7]

"Whether a statement is capable of having a defamatory meaning is a question of law for

the court." *Simpson v. Burrows*, 90 F.Supp.2d 1108, 1126 (D. Or. 2000).  In determining

whether a communication is capable of a defamatory meaning, "the court must look to the

general purport and intent of the article published and not to isolated sentences." *Kilgore v.*

*Koen*, 133 Or. 1, 10, 288 P. 192, 195 (1930).  "We are to read the article as a whole in order to

determine the sense in which particular words were used." *Marr v. Putnam*, 196 Or. 1, 26, 246

P.2d 509, 520 (1952).

> "To determine whether a statement implies a factual assertion, we
> examine the totality of the circumstances in which it was made.
> First, we look at the statement in its broad context, which includes
> the general tenor of the entire work, the subject of the statements,
> the setting, and the format of the work.  Next we turn to the
> specific context and content of the statements, analyzing the extent
> of figurative or hyperbolic language used and the reasonable
> expectations of the audience in that particular situation.  Finally,

---

[7] As noted above, Martino did not, in fact, use the word "lied" in that sentence.

Page 15  -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

> we inquire whether the statement itself is sufficiently factual to be
> susceptible of being proved true or false."

*Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995). *Accord, Partington v.*
*Bugliosi*, 56 F.3d 1147, 1153, 1154 (9th Cir. 1995) (allegedly defamatory publication must be
evaluated "with an eye towards readers' expectations and understandings of it") (internal
quotation marks, brackets, and citation omitted).

In considering context, courts take into account the nature of the medium in which the
allegedly defamatory statements appeared. In *Partington*, the Ninth Circuit said that readers of a
lawyer's book about his own accomplishments would expect to find "the highly subjective
opinions of the author rather than assertions of verifiable, objective facts." *Id*. at 1154.
Similarly, "[r]eaders expect that [editorial] columnists will make strong statements, sometimes
phrased in a polemical manner that would hardly be considered balanced or fair elsewhere in the
newspaper." *Ollman v. Evans*, 750 F.2d 970, 986 (D.C. Cir. 1984). "[S]ports columnists
frequently offer intemperate denunciations of coaches' play-calling or strategy, and readers know
this and presumably take such railings with a grain of salt." *Washington v. Smith*, 80 F.3d 555,
557 (D.C. Cir. 1996) (internal quotation marks, brackets, and citation omitted). Viewers of a
website "intended for a youthful audience *** would expect to find *** youthful, non-literal
language." *Knievel v. ESPN*, 393 F.3d 1068, 1077 (9th Cir. 2005). A newspaper's theater
column is "generally known to contain more opinionated writing than the typical news report."
*Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 729 (1st Cir. 1992) (footnote
omitted). And certainly in an era of talk radio that is characterized above all else by rhetorical
hyperbole, listeners to shows like *The Tom Martino Show* expect to hear strong opinions tinged
with polemic and hyperbole.

Page 16 -    MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
            SLAPP MOTION)

When Martino's statements are considered in context, it is clear that none of the three specifications of defamation alleged by plaintiffs (namely, (1) that Martino characterized them "as liars," (2) that he characterized them "as irresponsible and unresponsive to their customers," and (3) that he stated that "these people truly suck") is actionable.

> ### a. In Context, Martino's Statement, "They're Just Lying," Is A Non-Actionable Statement of Opinion, As a Matter of Common Law and As a Matter of First Amendment Law.

For a defamation claim to be legally sufficient, plaintiffs must show that the words "about which they complain are reasonably capable of a defamatory meaning," as a matter of common law, and "that they are not mere comment within the ambit of the First Amendment." *Knievel v. ESPN*, 393 F.3d at 1073-74 (internal quotation marks and citation omitted).

**Common Law.** Under the common law, statements of opinion are not provably true or false and are therefore not capable of a defamatory meaning. *King v. Menolascino*, 276 Or. 501, 555 P.2d 442 (1976) (opinion expressed in letter to editor was not capable of defamatory meaning); *Haas v. Painter*, 62 Or. App. 719, 725, 662 P.2d 768, 771, *review denied* 295 Or. 297, 668 P.2d 381 (1983) (same, with respect to opinions expressed in newspaper editorial). Although an accusation of lying can, in some circumstances, be considered a defamatory statement of fact (as in *Rajneesh Foundation v. McGreer*, 303 Or. 371, 374, 737 P.2d 593, 594 (1987), context is critical in evaluating any allegedly libelous statement, and in many contexts, a statement that someone is "lying" is a non-actionable statement of hyperbole or opinion.

In *Gill v. Delaware Park, LLC*, 294 F. Supp.2d 638 (D. Del. 2003), for example, the plaintiff, an owner of thoroughbred horses who had been excluded from a race track, sued the owners of the track and others for defamation and other claims. The defamation claim was based on a track official's statement, quoted in a newspaper, that plaintiff was "a liar."

Page 17 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

The court determined that the statement was a non-actionable statement of opinion. It

applied a four-factor test for determining whether, as a matter of common law, a statement is

opinion:

> "Those factors are: (1) consideration of the common usage or
> meaning of the challenged language; (2) ability to objectively
> verify the truth of the statement; (3) full context in which the
> statement was made; and (4) the broader social context into which
> the statement fits."

294 F. Supp.2d at 647. The court then applied those factors as follows:

> "In the present case, the alleged defamatory statement is
> that plaintiff is a 'liar.' Under the first factor, the term itself is
> certainly one which tends to disparage the plaintiff and, in certain
> circumstances, may be damaging to professional reputation. Under
> the second factor, however, the objective truth of the statement is
> less clear. The statement could have been interpreted to mean that
> plaintiff was lying in that particular case, or more generally, that
> plaintiff has the propensity to lie and was doing so in this particular
> case. The last two factors, the contextual considerations, weigh
> heavily toward the conclusion that the statement would be
> construed as mere opinion by the average reader and not
> actionable. In the exchange at issue, the plaintiff and defendant
> were clearly in a dispute over whether a particular conversation
> took place. The average reader, confronted with these statements,
> is more likely to view the term 'liar' as an epithet, rather than a
> statement of fact." 294 F. Supp.2d at 647.

The court came to a similar conclusion in *Faltas v. State Newspaper*, 928 F.Supp. 637 (D.

S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998) (table), *cert. denied*, 525 U.S. 1157, 119 S.Ct.

1065, 143 L.Ed.2d 69 (1999). The plaintiff in that case had published an op-ed column in a

newspaper on the subject of homosexuality. The newspaper later published a letter to the editor

in which the writer stated that one of the assertions in plaintiff's column "is either a joke or a lie;

and either way, this sort of fabrication has no place on the op/ed page." This statement was

"strong," the court said, but nevertheless fell into the category of "hyperbole" and was not
actionable as libel. 928 F.Supp. at 650.

The analyses in *Gill* and *Faltas* are applicable here. As noted above, in determining
whether a publication is capable of a defamatory meaning, a court must read "the article as a
whole," *Marr v. Putnam*, 246 P.2d at 520, not merely "isolated sentences." *Kilgore v. Koen*,
288 P. at 195. The transcript of the portion of *The Tom Martino Show* relating to plaintiff Mt.
Hood Polaris covers three typewritten pages. The conversation between Melissa Feroglia and
Tom Martino lasted approximately three minutes and 50 seconds. Most of that conversation
consisted of Feroglia's description of the history of her dealings with the dealer. She discusses
the repeated and continuing problems that she had had with the jet ski, and her frustration at the
ineffective and misleading response to those problems that she received from Mt. Hood Polaris.

Feroglia began by stating that she had "owned [the jet ski] for four and a half months, and
it's only run for 25 hours." (Transcript at 1; Feroglia Decl., Ex. 1.) She said she had taken it to
the shop in July, and "they put a new engine in" after the jet ski had run for only 18 hours. (*Id.*)
She said the new engine "didn't work. Labor Day weekend it broke down again." (*Id.*) Then
she and Martino had the following exchange (*id.* at 2-3):

| Martino: | Does it overheat every time you go out? |
|---|---|
| Melissa: | Yes, it does. |
| Martino: | Every single time you start that and go out, it overheats? |
| Melissa: | Mm-hmm, to some extent. Sometimes the overheat light will go on and off intermittently and sometimes it just stays on. |
| Martino: | All right. |
| Melissa: | And then the boat stalls. They've had it since September 8th. The dealer told me he was taking it back, that it was too much trouble for him to work |

Page 19 -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
             SLAPP MOTION)

on, and in his opinion it was a bad machine.  He wrote out an invoice saying that it was a buy back, and now they are not honoring that.

Martino:    So, you don't have anything?  You don't have your money or the machine?

Melissa:    No.

Martino:    Will he give your machine back?

Melissa:    He will.  He says that they think they've corrected the problem.  They took an intake valve that brings water in to cool it …

Martino:    Yeah.

Melissa:    … and drilled it out to make it bigger to see if that would help.

Martino:    Why don't they ….

Melissa:    It's not a new part, they just stuck a drill in it.

Martino:    Why don't they, why don't they go out and try it?

Melissa:    Well, on the 8th when I called and asked why it hadn't been tried, they said, all of a sudden they called me back two hours later and said, oh, we did try it, it works great.

Martino:    Yeah, they're just, yeah, they're just lying to you.

Melissa:    Right.  'Cause now it's November in Washington and I can't ride it to find out.

Martino:    Yeah, and you won't know until next spring.  But you have in writing something that says a buy back.

Melissa:    No, he put it in writing, and I asked for a copy.  He said I didn't need it.  However, I do have the senior shop technician verifying that he had the buy back order and was told not to work on the boat.

Martino:    You actually have, what do you mean you have him?  He'll admit it?

Melissa:    He did admit it to me on …

Martino:    No, but will he admit it to us?  Will they admit to us that they l… they went back on their word?

Page 20 -    MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

Melissa:      I don't know, they might.

Martino:      No, they're gonna say they never said it. Okay, we'll call them because I
              think and I want this to work but I think they're going to tell us, no,
              they're going to say, no, we never promised this. I mean, we'll ask them.

Plaintiffs allege that Tom Martino defamed them in this exchange, by "characteriz[ing]

the Gardners and Mt. Hood Polaris as liars." (Complaint, ¶ 10, incorporated into the libel claim

in ¶ 24.) Martino's statement is not actionable as a matter of common law. In the course of the

conversation leading up to Martino's statement that "they're just lying to you," Feroglia had told

Martino that the dealer had had her PWC in his shop on two different occasions; that the dealer

had replaced the engine on the first occasion but that she had had to take it back to the dealer on

September 8; and that the dealer still had it in the shop two months later, on the day of her

conversation with Martino. In the context of that demonstrated inability on the part of the dealer

to solve the problem, Feroglia told Martino that the dealer had made contradictory statements

two her on two different, critical, points.

First, as to the problems with the PWC and whether it could be repaired, Feroglia told

Martino that on the one hand, the dealer told her "it was too much trouble to work on [her PWC],

and in his opinion it was a bad machine," but on the other hand, he later said "they think they've

corrected the problem" and that "it works great." Second, as to her efforts to get her money

back, Feroglia told Martino that on the one hand, the dealer represented to her, in writing, that it

would "buy back" the PWC, but on the other hand, "now they are not honoring that [promise]."

It was in this context that Martino offered the opinion, "they're just lying to you." The

dealer had made contradictory and mutually inconsistent statements both as to the quality and

reparability of the PWC and as to his intention to buy back the PWC. In that context, Martino's

Page 21 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
            SLAPP MOTION)

comment, like the accusation of "liar" in *Gill v. Delaware Park*, "would be construed as mere opinion by the average [listener] and not actionable." 294 F.Supp.2d at 647.

That conclusion is also supported by *Troy Group, Inc. v. Tilson*, 364 F.Supp.2d 1149 (C.D. Cal. 2005). The defendant there, an investor in the plaintiff corporation, sent an email to a newspaper reporter and others, commenting on the majority shareholders' effort to take the company private, and asking, "Are these guys the biggest crooks on the planet or what?" The corporation and the majority shareholders sued him for defamation, and the defendant filed a motion to strike the complaint under California's anti-SLAPP statute, arguing that his statement was not capable of a defamatory meaning as a matter of common law and that it was protected as "mere comment" by the First Amendment. *Id.* at 1155. The plaintiffs cited two California state court decisions holding that statements that individuals are "crooks" were defamatory *per se*, but the court distinguished those cases, on the ground that "[i]n each case, the defaming parties affirmatively asserted that the plaintiffs were, in literal terms, crooks, whereas here, Tilson used the word 'crooks' in a clearly exaggerated rhetorical question that does not lend itself to a literal interpretation by the average reader." *Id.* at 1156. The court noted that "context can dull the literal meaning of even the most volatile language," *id.* at 1156, and held that the statement was not capable of a defamatory meaning, as a matter of common law.

That same conclusion is appropriate here. Even though an accusation of "lying," like an accusation of being "crooks," can be defamatory in some contexts, in the context of this case, Martino's statement that "they're just lying to you" was a nonactionable expression of opinion or rhetorical hyperbole.

**First Amendment.** Even if Martino's statement that "they're just lying" could be construed to be susceptible of a defamatory meaning as a matter of common law, the Ninth

Page 22 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
            SLAPP MOTION)

Circuit has held that such a statement, in a context very similar to the facts of this case, is not

actionable, as a matter of First Amendment law. "Although defamation is primarily governed by

state law, the First Amendment safeguards for freedom of speech and press limit state law. ***

The scope of constitutional protection extends to statements of opinion on matters of public

concern that do not contain or imply a provable factual assertion." *Underwager*, 69 F.3d at 366.

"Courts have extended First Amendment protection to such statements in recognition of the

reality that exaggeration and non-literal commentary have become an integral part of social

discourse." *Knievel v. ESPN*, 393 F.3d at 1974 (internal quotations marks and citation omitted).

The plaintiff in *Underwager* was a psychologist who frequently testified in child sexual

abuse cases. A television program "broadcast a documentary, 'Witness for Mr. Bubbles,' in

which American attorneys and psychologists disputed [plaintiff's] theories and credentials." *Id.*

at 364. Defendant Oates later replayed part of the program at a professional conference. The

plaintiff sued Oates and others for defamation, based on various statements in the program. The

district court concluded that only one of the alleged statements raised a possible issue of

defamation. The statement appeared in an interview of Peters, a lawyer who specialized in child

abuse matters, as follows:

> Munro: "In Mr. Bubbles case *** he said his qualifications were
> never in question."
>
> Peters: "Well, if he's talking about the Swan ruling, you could say
> he was perseverating."
>
> Munro: "Lying."
>
> Peters: "Yes."

*Underwager*, 69 F.3d at 367. The Ninth Circuit held that this accusation of "lying" was not

actionable:

Page 23 -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
           SLAPP MOTION)

"While we agree that Peters's statement may be an
exaggeration, Underwager has failed to show that the statement
implies a verifiable assertion of perjury. *** [T]he term 'lying'
applies to a spectrum of untruths including 'white lies,' 'partial
truths,' 'misinterpretation,' and 'deception.' As a result, the
statement is no more than nonactionable 'rhetorical hyperbole, a
vigorous epithet used by those who considered [the appellant's]
position extremely unreasonable.' *Milkovich* [*v. Lorain Journal
Co.*], 497 U.S. [1,] 17, 110 S.Ct. [2695], 2705 [111 L.Ed.2d 1
(1990)], (quoting *Greenbelt Cooperative Publishing Assn., Inc. v.
Bresler*, 398 U.S. 6, 13-14, 90 S.Ct. 1537, 1541-42, 26 L.Ed.2d 6
(1970) (holding that the word 'blackmail' used in that specific
context was no more than rhetorical hyperbole))."

*Underwager*, 69 F.3d at 367 (second set of brackets in original; footnote omitted).

The First Circuit came to a similar conclusion, as a matter of First Amendment law, in

*Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002). The principal defendant, Harr, was the author of a

book about a toxic tort case. Plaintiff Riley operated a tannery that was alleged, in the toxic tort

case, to have contributed to the environmental contamination. In Harr's book, in the course of

recounting some of the reactions of Schlichtmann, the attorney for the plaintiffs in the toxic tort

case, Harr wrote: "Riley had sworn at his deposition that he had never dumped anything on the

fifteen acres. Riley had lied then, and Schlichtmann—who didn't need much convincing—

believed that Riley was also lying about using [a particular toxic solvent]." *Id.* at 291.

The First Circuit held that Harr was reporting "Schlichtmann's assessment of Riley's

testimony," *id.* at 292, but that "even if *** the statement 'Riley had lied then' constitutes Harr's

own declaration that Riley had uttered a falsehood, the statement would still be protected under

the First Amendment," because the book "not only discussed the facts underlying Harr's views

but also gave information from which readers might draw contrary conclusions." *Id.* (quotation

marks, brackets, and citation omitted).

*See also Knievel v. ESPN*, 393 F.3d at 1075, citing with approval the holding of the

district court in *Cochran v. NYP Holdings, Inc.*, 58 F.Supp.2d 1113, 1124-25 (C.D. Cal.1998),

*aff'd*, 210 F.3d 1036 (9th Cir. 2000), that, in the words of the *Knievel* court, "a statement that

suggested that defense attorney Johnnie Cochran lied and exhibited unethical conduct was not

actionable as a matter of law because the statement appeared in an opinion column and the

author used 'loose, figurative, and hyperbolic' speech throughout the column."

These cases illustrate the importance of context in evaluating allegedly defamatory

statements. The Ninth Circuit has repeatedly stressed that "[w]hen determining whether a

statement can reasonably be interpreted as a factual assertion, we must examine 'the totality of

the circumstances in which it was made.' *** The context in which the statement appears is

paramount to our analysis, and in some cases it can be dispositive." *Knievel v. ESPN*, 393 F.3d

at 1074-75, quoting *Underwager*, 69 F.3d at 366. Like the readers of the book at issue in *Riley v.

Harr*, the listeners to the radio show at issue here were given information from which they

"might draw contrary conclusions." 292 F.3d at 292. Listeners to *The Tom Martino Show* heard

Melissa Feroglia describe her experiences with the dealer, including the inconsistent and

contradictory statements that the dealer had made on the two critical issues of (a) the quality and

reparability of the PWC and (b) the promised refund of the purchase price. When Tom Martino

said "they're just lying," that was his off-the-cuff reaction to what Feroglia had said. Like the

accusation of "lying" in *Underwager*, Martino's statement was "nonactionable rhetorical

hyperbole, a vigorous epithet used by [one] who considered [plaintiffs' conduct] extremely

unreasonable." 69 F.3d at 367. And listeners could draw their own, contrary, conclusions from

Feroglia's account of what had happened. *See Partington*, 56 F.3d at 1156 ("when a speaker

outlines the factual basis for his conclusion, his statement is protected by the First Amendment");

Page 25 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
            SLAPP MOTION)

*Dodds v. American Broadcasting Co.*, 145 F.3d 1053, 1067 (9th Cir. 1998) (an opinion "based on an implication arising from disclosed facts is not actionable when the disclosed facts themselves are not actionable") , *cert. denied* 525 U.S. 1102, 119 S. Ct. 866, 142 L.Ed.2d 769 (1999); *Standing Comm. on Discipline of the United States Dist. Court v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995) ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning").

"[W]here the question of truth or falsity is a close one, a court should err on the side of nonactionability." *Partington*, 56 F.3d at 1159 (internal quotation marks, brackets, and citation omitted). For the reasons set out above, Martino's statement that "they're just lying" is not actionable, as a matter of First Amendment law.

> **b.  Martino's Alleged Characterization of Plaintiffs As "Irresponsible and Unresponsive to Their Customers" Is a Nonactionable Statement of Opinion. To The Extent that It Is a Statement of Fact, It Is Substantially True.**

Plaintiffs allege that Martino defamed them by "characteriz[ing] [them] as irresponsible and unresponsive to their customers." (Complaint, ¶ 10, incorporated into the libel claim in ¶ 24.) They do not specify which statements by Martino allegedly carried that connotation. In evaluating an allegation of defamation, the court must consider the actual words used by the defendants, rather than plaintiffs' characterization of them. That principle is illustrated in *Card v. Pipes*, where Judge Hogan "review[ed] a copy of the actual publication submitted by defendant" rather than the plaintiff's "paraphrase" of statements in the article. (Hinkle Decl., Ex. 2 at 11.)

If it is assumed that Martino's comments did imply that Mt. Hood Polaris was "irresponsible and unresponsive to [its] customers," that is plainly a statement of opinion, based on the disclosed facts. Moreover, it was Feroglia, not Martino, who described her contacts with

Page 26 -    MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

Mt. Hood Polaris, and as the Feroglia Declaration shows, what Feroglia said on the radio program was entirely accurate and truthful.

Feroglia began her on-air conversation with Martino by stating that she had owned her PWC "for four and a half months, and it's only run for 25 hours." The dealer had told her both that "it was too much trouble for him to work on and that in his opinion it was a bad machine" and that "it works great." The dealer had written our "an invoice saying that it was a buy back," and had then refused to "honor[]" that promise. When she had asked for a copy of the written "buy back" promise, the dealer had told her that she "didn't need it." (Transcript at 2-4; Feroglia Decl., Ex. 2.)

Those were statements that Feroglia had made on the air. In addition, Feroglia had given other information to Martino and his staff, based on the diary that she kept of her experiences. The dealer had told her that someone from the manufacturer "should have called" her. (Diary at 4; Feroglia Decl. Ex. 1.) Someone from the manufacturer later called her, and told her that the manufacturer "never" buys back boats, that it was "not responsible in any way in this situation," and that she "will need to work with the dealer to try to return the boat." (*Id*.) The dealer then told her he would "make some calls and get back to [her] today or tomorrow" (*Id*. at 5), and then she heard nothing until she called him, three days later. In that call, the dealer said he was now trying to repair the PWC again. (*Id*.) The next day, October 22, the manufacturer's representative told her that Polaris Industries would "cut a check to the dealer" for her refund, and told her "to call the dealer to discuss it." (*Id*.) She talked to John Gardner on October 25, when he told her he would talk to the manufacturer and "get back to [her]" (*id*.), but then she heard nothing from him for the next two weeks. (*Id*. at 6.)

Page 27 -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

Finally, on November 8, two months after the dealer told her it was a "buy back" and more than two weeks after the manufacturer told her it would "cut a check" for the refund, she sent a written demand for a refund to the dealer, with a copy to the manufacturer. (Feroglia Decl., Ex. 1 at 7.) When she still had no response three days later, she went on *The Tom Martino Show* to describe her experience. Only after her appearance on that program did the manufacturer send her a check.

Thus, the implication that plaintiffs allege can be drawn from the program (namely, that plaintiffs were "irresponsible and unresponsive to their customers") was both a statement of opinion and a substantially true description of what had happened. (Under the "substantial truth" doctrine, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Magazine*, 501 U.S. 496, 516-17, 111 S. Ct. 2419, 2433, 115 L.Ed.2d 447 (1991).) As the Feroglia Declaration shows, Feroglia *had* been getting the run-around from John Gardner and Mt. Hood Polaris. They *had* told her that the PWC was "too much trouble to work on," but (later) that "it works great." They *had* promised to buy back her PWC. They *had* failed to perform that promise. They *had* attempted to shift responsibility for the buy back to the manufacturer.

For these reasons, plaintiffs' allegation of defamation based on the alleged characterization of irresponsibility and unresponsiveness should be stricken.

### c. Martino's Statement that "These People Truly Suck" Is Not an Actionable Statement of Fact.

The only other statement that plaintiffs allege to be libelous is Martino's statement that "these people truly suck." (Complaint, ¶ 10, incorporated into the libel claim in ¶ 24.) But that statement was not a statement of fact; in the common vernacular of the day, to say that someone or something "sucks" is simply to express disapproval. In *Steinhilber v. Alphonse*, 501 N.E.2d

550 (N.Y. 1986), the plaintiff continued to work at her company when the union of which she was a member went out on strike. During picketing activity at the company's offices, a union banner proclaimed: "Scab Louise Steinhilber Sucks." Steinhilber sued for libel. New York's highest court unanimously held that the statement was not actionable, expressly agreeing with the conclusion of the intermediate appellate court "that the banner, in 'the context in which the statement was made', was intended as 'an expression of disapproval' and that it was, as such, an opinion and not actionable." *Id.* at 556.

There are many other reported decisions in which similar offensive remarks have been held to be insufficient to support a libel claim. In *Simpson v. Burrows*, *supra*, for example, this court noted that calling a person "a pervert, a degenerate, or an immoral person" can subject a person to "hatred, contempt, and ridicule," but it nevertheless held that "[w]hile rude, boorish, churlish, and mean, [such labels] amount to only rhetoric and ranting and are not the kind of ascertainable factual statements required to sustain a defamation claim." 90 F.Supp.2d at 1126. *See also Knievel v. ESPN*, 393 F.3d at 1078 (calling Evel Knievel a "pimp" was, in context, "satirical, risque, and sophomoric," but not capable of defamatory meaning); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (accusation of being "racist" not actionable; "[t]he word has been watered down by overuse, becoming common coin in political discourse"); *Koch v. Goldway*, 817 F.2d 507, 508, 510 (9th Cir. 1987) (statement implying that plaintiff was "a well-known Nazi war criminal" was a "vicious slur," but nevertheless "an opinion, and not a statement of fact, and therefore not a defamation"; "[b]ase and malignant speech is not necessarily actionable"); *Phantom Touring, Inc.*, 953 F.2d at 728 (calling a touring theatrical production "a rip-off, a fraud, a scandal, a snake-oil job" not actionable, because it was "figurative and hyperbolic"); *Hickey v. Settlemier*, 141 Or. App. 103, 109-10, 917 P.2d 44, 48-49

Page 29 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

(describing animal dealer's treatment of animals as "inhuman" was "nonactionable opinion"), *review denied*, 323 Or. 690, 920 P.2d 549 (1996).

Moreover, the statement that "these people suck" is a protected expression of opinion under the First Amendment, even if it were actionable as a matter of common law. See *Lieberman v. Fieger*, 338 F.3d 1976, 1080 (9th Cir. 2003) (statements that psychiatrist was "Looney Tunes," "crazy," "nuts," and "mentally unbalanced" were "colorful expressions" and "constituted an expression of opinion, protected by the First Amendment"); *Standing Comm. v. Yagman*, 55 F.3d at 1440 ("dishonest," "ignorant," "ill-tempered," "buffoon," "sub-standard human," "right-wing fanatic," "a bully," when applied to a judge, were "lusty and imaginative expressions" (internal quotation marks, bracket, and citation omitted) and "statements of rhetorical hyperbole," protected by the First Amendment).

For all of these reasons, plaintiffs cannot "establish that there is a probability that [they] will prevail on the [defamation] claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). Their defamation claim should be stricken.

> ### d. If the Defamation Claim Is Not Stricken Entirely, Then Susan Gardner's Defamation Claim Should Be Stricken, Because None of the Alleged Statements Were "About" Her.

If the court concludes that Martino's statement that "they're just lying" is actionable as defamation, it should nevertheless strike Susan Gardner's defamation claim. "[T]he fact [that a] SLAPP motion [is] denied as to some *** causes of action does not preclude granting the motion as to the remaining causes of action." *ComputerXpress, Inc. v. Jackson*, 113 Cal.Rptr.2d at 636.

As noted above, "[t]o establish a claim for defamation, [a] plaintiff must first show that defendants made defamatory statements about [him or] her." *Simpson v. Burrows*, 90 F.Supp.2d

Page 30 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

at 1126. Neither Melissa Feroglia nor Tom Martino mentioned the name of either John Gardner

or Susan Gardner, or of any other individual, during the broadcast. In discussing the problems

that she had had with the water craft and the dealer's inability to repair it, Feroglia said:

> "They've had it since September 8th. The dealer told me he was
> taking it back, that it was too much trouble for him to work on, and
> in his opinion it was a bad machine. He wrote out an invoice
> saying that it was a buy back, and now they are not honoring that."
> (Transcript at 2; Feroglia Decl., Ex. 2.)

Martino then asks her, "Will he give your machine back?" and Feroglia responds, "He will. He

says that they think they've corrected the problem." (*Id*.)

On the next page, Feroglia says: "I do have the senior shop technician verifying that he

had the buy back order and was told not to work on the boat." (*Id*. at 3.)

During the entire conversation, these were Feroglia's only references to any individual:

the reference to "the dealer" and the reference to "the senior shop technician," both of whom she

referred to as "he." There is no mention of Susan Gardner, and no reference to any feminine

pronoun or adjective. There is nothing in the broadcast that would lead any listener to believe

that either Melissa Feroglia or Tom Martino was talking about Susan Gardner. Nothing in the

broadcast was "about" Susan Gardner, *Simpson v. Burrows*, 90 F.Supp.2d at 1126, and her

defamation claim should be stricken.

### 2. The False Light Claim.

#### a. The False Light Claim Should Be Stricken in Its Entirety, For the Same Reason that the Defamation Claim Should Be Stricken.

Plaintiffs' claim for "false light invasion of privacy" is alleged by all three plaintiffs

against all defendants. "Invasion of privacy by 'false light' requires that the matter be both *false*

(or that it create a false impression) and *publicized*." *Marleau v. Truck Ins. Exchange*, 333 Or.

Page 31 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

82, 92-93, 37 P.3d 148, 154 (2001) (emphasis in original). The same First Amendment defenses that apply to defamation cases also apply to false light claims. *Time, Inc. v. Hill*, 385 U.S. 374, 587-88, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

Under California law, "[w]hen an invasion of privacy claim rests on the same allegations as a claim for defamation, the former cannot be maintained as a separate claim if the latter fails as a matter of law," *Cort v. St. Paul Fire & Marine Ins. Cos., Inc.*, 311 F.3d 979, 987 (9th Cir. 2002) (internal quotation marks, ellipses, and citation omitted), and the same thing is true in Oregon. *Reesman v. Highfill*, 327 Or. 597, 608, 965 P.2d 1030, 1036-37 (1998) (rejecting false light claim for the same reasons that defamation claim was rejected). As shown above, the statements about which plaintiffs claim are protected statements of opinion, substantially true, or both. Moreover, they are protected by the First Amendment. See *Partington*, 56 F.3d at 1160 ("reject[ing] Partington's false light claims regarding the two contested statements *** for the same reason that we rejected his defamation claims based on those statements: both statements are protected by the First Amendment, regardless of the form of tort alleged"). Plaintiffs' "false light" claims should therefore be stricken for the same reasons that their defamation claims should be stricken.

> **b.    The False Light Claim Should Be Stricken for the Independent Reason that Plaintiffs Cannot Show Actual Malice.**

There is a separate and independent reason that plaintiffs' false light claims should be stricken. "[J]ust like public figure defamation, [a false light claim] requires actual malice—knowing or reckless disregard of the truth." *Flowers v. Clinton*, 310 F.3d 1118, 1132 (9th Cir. 2002). A false light plaintiff must plead and prove that the defendant had "knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which

the other would be placed." *Restatement (Second) of Torts*, § 652E (1977), adopted in *Dean v. Guard Pub. Co., Inc.*, 73 Or. App. 656, 660, 699 P.2d 1158, 1160 (1985).

In making this required showing of "actual malice," a plaintiff must do more than demonstrate that "defendants 'rel[ied] on statements made by a single source,' *** or failed to verify statements received from an 'adequate news source,' or performed 'slipshod investigation.'" *McNabb v. Oregonian Publishing Co.*, 69 Or. App. 136, 140, 685 P.2d 458, 461 (citations omitted), *rev. denied* 297 Or. 824, 687 P.2d 797 (1984), *cert. denied* 469 U.S. 1216, 105 S. Ct. 1193, 84 L.Ed.2d 339 (1985). "[R]eckless conduct amounting to actual malice 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.' *** Rather, 'knowledge' or 'reckless disregard' is a subjective matter, a question of state of mind, quite distinct from any question of objective reasonableness or prudence." *Id.*, 685 P.2d at 461 (citations omitted). To show actual malice, plaintiffs must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and that he "had obvious reasons to doubt the veracity of [his statement], but deliberately avoided learning the truth." *Dodds v. American Broadcasting Co.*, 145 F.3d at 1062 (internal quotation marks and citation omitted).

In response to a special motion to strike under ORS 31.150, a plaintiff must "establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). With respect to their false light claims, that means that plaintiffs must come forward with "substantial evidence" that Martino had "serious doubts as to the truth of his [statements]," *St. Amant*, 390 U.S. at 731, and that he

Page 33 -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

"deliberately avoided learning the truth." *Dodds v. American Broadcasting Co.*, 145 F.3d at

1062. Plaintiffs cannot make that showing, and their false light claims should be stricken.

> **c.  If the False Light Claims Are Not Stricken In Their Entirety,**
> **Then the False Light Claim of Mt. Hood Polaris Should Be**
> **Stricken, Because a Corporation Has No Right of Privacy.**

"A corporation, partnership or unincorporated association has no personal right of

privacy. It has therefore no cause of action for any of the four forms of invasion [of privacy]

covered by §§ 652B to 652E." *Restatement (Second) of Torts*, § 652I, comment c (1977)

*Accord, Southern Air Transp. v. American Broad. Cos.*, 670 F. Supp. 38, 42 (D. D.C. 1987),

*aff'd*, 877 F.2d 1010 (D.C. Cir. 1989); *Eberhardt v. Morgan Stanley Dean Witter Trust FSB*,

2001 WL 111024, *5 (N.D. Ill. 2001); *L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F. Supp.

1425, 1430 (D. Conn. 1986); *Gorman v. Swaggart*, 524 So.2d 915, 920 (La. App. 1988). See

also *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950)

("corporations can claim no equality with individuals in the enjoyment of a right to privacy").

Plaintiff Mt. Hood Polaris, Inc., is a corporation. (Complaint, ¶ 1.) It has no "personal

right of privacy," and it cannot assert a claim for false light invasion of privacy.

> **d.  If the False Light Claims Are Not Stricken In Their Entirety,**
> **Then the False Light Claim of Susan Gardner Should Be**
> **Stricken, Because None of the Statements in the Broadcast**
> **were "Of and Concerning" Her.**

The plaintiff in a false light case "must show that the publicity at issue is 'of and

concerning' him." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003).

*Accord, Lohrenz v. Donnelly*, 223 F.Supp.2d 25, 40 (D. D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C.

Cir. 2003), *cert. denied*, 541 U.S. 1042, 124 S.Ct. 2167, 158 L.Ed.2d 731 (2004).

As shown above, the only references to any individual during the relevant portions of *The*

*Tom Martino Show* were to "the dealer" and to "the senior shop technician," both of whom were

Page 34 -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
           SLAPP MOTION)

referred to as "he." There is no mention of Susan Gardner, and no reference to any feminine pronoun or adjective. There is nothing in the broadcast that would lead any listener to believe that either Melissa Feroglia or Tom Martino was talking about Susan Gardner. Nothing in the broadcast was "of and concerning" Susan Gardner, and her false light claim should be stricken.

### 3. The Intentional Interference Claims.

The Third Claim in the complaint, for intentional interference with existing economic relations (Complaint, ¶¶ 34-37), and the Fourth Claim, for interference with prospective economic advantage (*Id.*, ¶¶ 38-40), are asserted only on behalf of Mt. Hood Polaris.

Under Oregon law, the tort of intentional interference with existing or prospective business relations requires proof of six elements: "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) *accomplished through improper means or for an improper purpose*, (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages." *Allen v. Hall*, 328 Or. 276, 281, 974 P.2d 199, 202 (1999) (emphasis added).

Plaintiffs do not allege that Martino had any improper purpose in making his statements; they allege only that he used "improper means" to interfere with their relationships with their customers. (Complaint, ¶¶ 36, 39.) When the "means" of interfering with business relationships consists solely of allegedly defamatory statements, as in this case, the means can be "improper" only if the statements are defamatory.

For all of the reasons set out above, plaintiffs' allegations of defamation and false light invasion of privacy are not actionable. Each of the statements about which plaintiffs complain was a non-actionable statement of opinion, substantially true, or both. Moreover, each of the

Page 35 - MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

statements was a protected expression of opinion under the First Amendment. There is nothing improper, as a matter of law, about making statement that are protected by the common law and by the First Amendment. Plaintiffs' claims of interference with existing and prospective economic relations should therefore be stricken for the same reasons that the defamation and false light claims should be stricken.

### 4. If Plaintiffs' Claims Are Not Stricken In Their Entirety, Then Their Claims for Lost Profits and Lost Sales Should Be Stricken, Because They Cannot Prove Causation.

The anti-SLAPP statute requires plaintiffs to present "substantial evidence to support a prima facie case" that they will prevail on their claims. ORS 31.150(3). "A 'prima facie case' is that state of facts which entitles the party to have the case go to the jury." *Doherty v. Hazelwood Co.*, 90 Or. 475, 484, 177 P. 432, 432 (1919).

Here, plaintiffs have alleged, as an element of each of their claims, that they suffered "economic damages." In their false light claim, they allege that "As a direct and proximate result of the invasion of privacy, Mt. Hood Polaris has sustained economic damages in an amount at least equal to $600,000," and that "As a direct and proximate result of the invasion of privacy the Gardners have sustained economic damages in an amount at least equal to $600,000." (Complaint, ¶¶ 20, 21.) They make the same allegations in their defamation claim. (*Id.*, ¶¶ 29, 30.) In the intentional interference claims, alleged only on behalf of Mt. Hood Polaris, plaintiffs allege that the company was damaged in its existing economic relations "in the amount of at least $100,000" and in its prospective economic relations "in the amount of at least $600,000." (*Id.*, ¶¶ 37, 40.) These allegations of economic damages are apparently all based on alleged lost sales, since plaintiffs John Gardner and Susan Gardner also separately allege noneconomic damages in the form of various "'subjective, nonmonetary losses.'" *Simpson v. Burrows*, 90 F.Supp.2d at

Page 36 -  MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

1127, quoting the definition of "noneconomic damages" in *former* ORS 18.560(2)(b) (renumbered ORS 31.710(2)(b) in 2003). (Complaint, ¶¶ 22, 23, 31, 32.)[8]

Plaintiffs' allegations that their economic damages (that is, their lost sales) were the "result" of the statements allegedly made by Tom Martino show that they recognize that causation is a necessary element of their claims: that is, they must prove that their damages were caused by Martino's statements, rather than by Melissa Feroglia's statements (or by some other cause). Thus, in *DeLashmitt v. Journal Pub. Co.*, 166 Or. 650, 655, 114 P.2d 1018, 1020 (1941), the court reversed a judgment for the plaintiff in a libel case, because "the evidence wholly fails to indicate that the decline in the plaintiff's business was in any way caused by the publication of the defamatory article. It is manifest that a causal connection must be established. 'The defamatory matter must be the proximate cause of the business losses.'" The same causation requirements exist in false light and intentional interference claims. *Simpson v. Burrows*, 90 F.Supp.2d at 1127-28 (in invasion of privacy claims, "recoverable damages include any special damages of which the invasion is the legal cause"); *Allen v. Hall*, 974 P.2d at 202 (plaintiff in intentional interference case must prove "a causal effect between the interference and the harm to the relationship or prospective advantage").

In this case, plaintiffs' theory of causation with respect to their claims for economic damages is that their company lost sales—but *not* because of Melissa Feroglia's accurate account of her frustration with her PWC, with the dealer's inability to repair it, with the dealer's contradictory statements about the reparability of the PWC, and with the dealer's refusal to honor its promise to buy it back. Rather, plaintiffs allege that it was Tom Martino's *responses* to

---

[8] Although plaintiffs pray for a judgment in favor of Mt. Hood Polaris for "[n]oneconomic damages in the amount of $600,000" (Complaint at 9, line 19), they do not allege that the corporation has sustained any noneconomic damages. That portion of the prayer for relief is therefore without effect.

Page 37 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)

Feroglia's account of what happened, and specifically his statements that "they are just lying to you" and that "these people truly suck," that caused them to incur economic damages, including the decision by their customers to cancel orders that they had previously placed.

The plaintiff in *Faltas v. State Newspaper*, *supra*, 928 F.Supp. 637, had a similar theory of causation and damages. She contended that she lost her job as a medical school resident, not because of the controversial op-ed column that she herself had published, but because of the defendant's later statement, in a letter to the editor, that her op-ed piece was "a joke or a lie" and a "fabrication." *Id.* at 650-52. The court rejected her theory. It noted that "[o]ne of the most basic principles of tort law is that a person who breaches a duty to a plaintiff is not liable for injuries unless the injuries were proximately caused by the breach," *id.* at 651, and it held that "her claim fails because there is no evidence of any damages proximately resulting from the allegedly defamatory statements. *** While it is plausible that a person might be fired for publishing controversial opinions, it is simply too much of a leap in logic to presume that the firing would not have occurred *but for the publication of later letters to the editor* complaining about the initial controversial opinion piece." *Id.* (emphasis in original).

A similar analysis is appropriate here. In response to a motion to strike under the anti-SLAPP statute, plaintiffs must come forward with "substantial evidence" to support their allegations (1) that they incurred damages of "at least $100,000" in the form of cancellation of existing orders (Complaint, ¶¶ 18, 35-37), and damages of "at least $600,000" in the form of lost prospective sales (*id.*, ¶¶ 20, 29, 40), and (2) that these damages were proximately caused by Martino's use of the word "lying," and not because of the accurate description of her frustrating experiences that Feroglia gave. If they do not come forward with such evidence (and if their complaint has not been stricken for the reasons set out elsewhere in this memorandum), then the

Page 38 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

Third and Fourth Claims in the complaint (for intentional interference, on behalf of Mt. Hood
Polaris) should be stricken in their entirety, because those claims are based solely on allegations
of lost sales, and the allegations of economic damages should be stricken from the First and
Second Claims (Complaint, ¶¶ 20, 21, 29, 30).

## V.    CONCLUSION

Plaintiffs' claims of false light invasion of privacy, defamation, and interference with
economic relations are exactly the kind of claims that the anti-SLAPP statute was intended to
discourage: they are "meritless first amendment [claims] aimed at chilling expression through
costly, time-consuming litigation." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d at 1109. Plaintiffs
cannot "establish that there is a probability that the plaintiff will prevail on the claim by
presenting substantial evidence to support a prima facie case." ORS 31.150(3). Their claims
should be stricken, and defendants should be awarded their reasonable attorney fees and costs
under ORS 31.152(3).

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

Page 39 -    MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

If the court does not strike plaintiffs' claims in their entirety, it should strike Susan

Gardner's claims for invasion of privacy and defamation, because Tom Martino said nothing that

could be construed to refer to her; it should strike Mt. Hood Polaris's claim for invasion of

privacy, because a corporation has no right of privacy; and it should strike all allegations of

economic damages, unless plaintiffs come forward with "substantial evidence" to establish that it

was Martino's statements, and not Feroglia's accurate account of her experiences, that led to the

loss of existing and future sales.

DATED: July 8, 2005.

STOEL RIVES LLP

*Charles F. Hinkle*

CHARLES F. HINKLE, OSB No. 71083
cfhinkle@stoel.com
BRAD S. DANIELS, OSB No. 02517
bsdaniels@stoel.com
Telephone: (503) 224-3380

Attorneys for Defendants Tom Martino and
Westwood One, Inc.

Page 40 -   MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE (ANTI-
SLAPP MOTION)

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **MEMORANDUM IN SUPPORT OF**

**SPECIAL MOTION TO STRIKE (ANTI-SLAPP MOTION)** on the following named

persons on the date indicated below by

■   mailing with postage prepaid

□   hand delivery

□   facsimile transmission

□   overnight delivery

□   email

□   notice of electronic filing using the Cm/ECF system

to said persons a true copy thereof, contained in a sealed envelope, addressed to said persons at

his or her last-known addresses indicated below.

| | |
|---|---|
| Linda L. Marshall | Duane A. Bosworth |
| PMB 408 | Davis Wright Tremaine LLP |
| 3 Monroe Parkway, Suite P | Suite 2300 |
| Lake Oswego, OR 97035 | 1300 SW Fifth Avenue |
| | Portland, OR 97201 |

DATED: July 8, 2005.

*Charles F. Hinkle*

Charles F. Hinkle, OSB No. 71083
Telephone: (503) 224-3380

Of Attorneys for Defendants Tom Martino and
Westwood One, Inc.

Page 1    -    CERTIFICATE OF SERVICE