1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11  JOHN M. GARDNER and SUSAN L.     )
    GARDNER, husband and wife,       )
12  and MT. HOOD POLARIS, INC.,      )
    an Oregon corporation,           )
13                                   )    No.  CV-05-769-HU
                         Plaintiffs, )
14                                   )
            v.                       )
15                                   )
    TOM MARTINO, dba *THE TOM*       )
16  *MARTINO SHOW*, WESTWOOD ONE,    )
    INC., a Delaware corporation,    )    FINDINGS & RECOMMENDATION
17  and CLEAR CHANNEL COMMUNI-       )
    CATIONS, INC., a Texas cor-      )
18  poration,                        )
                                     )
19                       Defendants. )
                                     )
20  _____)

    Linda L. Marshall
21  PMB 408
    3 Monroe Parkway, Suite P
22  Lake Oswego, Oregon 97035

23          Attorney for Plaintiffs

24  Charles F. Hinkle
    Brad S. Daniels
25  STOEL RIVES LLP
    900 S.W. Fifth Avenue, Suite 2600
26  Portland, Oregon 97204

27          Attorneys for Defendants Tom Martino & Westwood One, Inc.

28  / / /


    1 - FINDINGS & RECOMMENDATION

Duane A. Bosworth
Kevin H. Kono
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2300
Portland, Oregon 97201

Attorneys for Defendant Clear Channel Communications, Inc.

HUBEL, Magistrate Judge:

Plaintiffs John Gardner, Susan Gardner, and Mt. Hood Polaris, Inc., bring this tort action against defendants Tom Martino, dba The Tom Martino Show, Westwood One, Inc., and Clear Channel Communications, Inc. Plaintiffs' claims include false light invasion of privacy, defamation, intentional interference with economic relations, and intentional interference with prospective economic advantage. All claims arise out of statements made by Martino, a syndicated radio talk show host, about Mt. Hood Polaris, which is owned and operated by John and Susan Gardner.

Defendants move to "strike" all claims pursuant to Oregon Revised Statute § (O.R.S.) 31.150. I recommend that the motion be granted.

BACKGROUND

John and Susan Gardner own and operate Mt. Hood Polaris, which sells personal watercraft (PWC) and other outdoor recreational motorized vehicles such as all-terrain vehicles and snowmobiles, manufactured by Polaris Industries, Inc.

In 2004, Mt. Hood Polaris sold a PWC to customer Melissa Feroglia. She had problems with the PWC, explained in more detail below, causing her to ultimately demand a refund sometime in the fall of 2004. Apparently frustrated with a lack of response to her refund demand, she contacted The Tom Martino Show to complain about the service, or lack thereof, she was receiving from plaintiffs.

2 - FINDINGS & RECOMMENDATION

Tom Martino hosts a talk radio show focusing on consumer complaints. He takes calls from frustrated consumers and attempts to get their grievances resolved by calling the target of the consumer's frustration. His website is known as the "troubleshooter" and he promotes himself as a consumer advocate.

Martino's show originates on station KHOW in Denver, Colorado, where it is broadcast live from 9:00 a.m. to 12:00 p.m., Monday through Friday. Westwood distributes the show to other radio stations in other cites for later rebroadcast. One of the stations rebroadcasting the show is KEX in Portland. KEX is owned by defendant Clear Channel.

During the week of November 8, 2004, Feroglia, who had emailed Martino about her problem in late October, received a call from "Chris," an assistant for Martino, who asked if she would discuss her problems regarding the PWC on the air with Martino. Feroglia agreed to do so, and was asked to call the show on the morning of Thursday, November 11, 2004, during the time when the show is broadcast live in Denver. Feroglia complied with this request.

A transcript of the entire discussion between Feroglia and Martino is appended to this Findings & Recommendation. As seen there, Martino spoke with Feroglia three separate times over the course of about  fifty-five minutes. In the first segment, Feroglia recites a detailed history of the problems with the PWC, the attempts at repair, and the buy back she thought the dealer had promised. At the end of this first segment, "Chris" reports that he tried to call the dealer, but got no answer. He indicated he would keep trying. At one point during the first segment, Martino responds to a comment by Feroglia by stating that "they're just

3 - FINDINGS & RECOMMENDATION

lying to you." Not long after making that comment, Martino asks "[w]ill they admit to us that they l... they went back on their word?"

The second segment includes a discussion between Martino and "Chris," in which Chris reports that he successfully contacted the "general manager" at Mt. Hood Polaris who told Chris that Chris would have to contact Polaris Industries, the manufacturer. Martino concludes that segment by stating that the next step is to contact Polaris Industries.

Martino opens the third segment by stating that "Polaris sucks." He gives a summary of the facts as reported to him by Feroglia, the response by Mt. Hood Polaris to the phone call from Martino's staff, and then the response by Polaris Industries to a phone call from Martino's staff, which Martino explains was to tell the customer to contact the dealer.

After making some additional comments, Martino concludes the third segment by giving the phone numbers for both Polaris Industries and Mt. Hood Polaris.

Plaintiffs allege that as a result of statements made by Martino concerning Mt. Hood Polaris, the company received "hundreds of angry calls" from people proclaiming that they would not do business with Mt. Hood Polaris. They also received calls from people barraging them and their employees with "vulgar and insulting accusations," received threats on their lives, and received "threats of violence and injury to the business." Am. Compl. at ¶ 16. They allege that the flood of angry and abusive calls continued throughout the day on November 11, 2004, and into November 12, 2004. Id. at ¶ 17. Additionally, on November 11,

4 - FINDINGS & RECOMMENDATION

2004, and continuing into the following couple of weeks, people allegedly drove by the store and shouted "abusive, profane, and otherwise derogatory comments about plaintiffs" to plaintiffs and their customers. <u>Id.</u> Moreover, following the broadcast, several customers who had ordered products in the spring and summer of 2004 for delivery in November and December 2004, allegedly canceled their orders. <u>Id.</u>

## DISCUSSION

In the Amended Complaint, plaintiffs' claims are based on several comments by Martino, including "they are just lying to you," and "[w]ill they admit to us they l..., they went back on their word?". Am. Compl. at ¶¶ 11, 12. Although the Amended Complaint suggests that plaintiffs base their claims on other additional comments by Martino, in response to this motion plaintiffs rely only on the two "lying" statements. At oral argument, plaintiffs' counsel explained that while plaintiffs are not withdrawing the other statements, they are relying on only the "lying" comments in opposing defendants' motion. Accordingly, I address only those comments in this Findings & Recommendation.[1]

/ / /

---

[1] There appears to be a disputed fact regarding the second "lying" statement. In the transcript, Martino states "[n]o, but will he admit it to us? Will they admit to us that they l... they went back on their word?" Plaintiffs' Amended Complaint alleges that Martino actually used the word "lied." Am. Compl. at ¶ 12. Although plaintiffs may not rest on the allegations in the Amended Complaint in the face of this motion, and plaintiffs admit in their memorandum that Martino's words in the actual broadcast are muffled and difficult to hear at the critical point, I assume for the purposes of this motion that Martino used the word "lied," or that listeners would have heard enough of the word to understand it to be "lied."

5 - FINDINGS & RECOMMENDATION

I. O.R.S. 31.150

O.R.S. 31.150 - 31.155 comprise Oregon's "anti-SLAPP" statutes. "Anti-SLAPP" stands for "Anti-Strategic Lawsuit Against Public Participation." <u>Metabolife Int'l, Inc. v. Wornick</u>, 264 F.3d 832, 837 n.7 (9th Cir. 2001). The purpose of similar statutes has been described as the "protect[ion of] individuals from meritless, harassing lawsuits whose purpose is to chill protected expression." <u>Id.</u>

Oregon's statute was enacted in 2001. Or. Laws 2002, ch. 616. It provides as follows:

(1) A defendant may make a special motion to strike against a claim in a civil action described in subsection (2) of this section. The court shall grant the motion unless the plaintiff establishes in the manner provided by subsection (3) of this section that there is a probability that the plaintiff will prevail on the claim. The special motion to strike shall be treated as a motion to dismiss under ORCP 21A but shall not be subject to ORCP 21F. Upon granting the special motion to strike, the court shall enter a judgment of dismissal without prejudice.

(2) A special motion to strike may be made under this section against any claim in a civil action that arises out of:

(a) Any oral statement made, or written statement or other document submitted, in a legislative, executive or judicial proceeding or other proceeding authorized by law;

(b) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law;

(c) Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or

(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in

> connection with a public issue or an issue of public interest.
>
> (3)  A defendant making a special motion to strike under the provisions of this section has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section.  If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case.  If the plaintiff meets this burden, the court shall deny the motion.
>
> (4)  In making a determination under subsection (1) of this section, the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

O.R.S. 31.150.

Defendants in federal court may avail themselves of the anti-SLAPP statute provisions. <u>Card v. Pipes</u>, No. CV-03-6327-HO, Order at pp. 17-18 (D. Or. Mar. 1, 2004) (Oregon anti-SLAPP motions may be made in diversity cases in federal court, including those removed to federal court from state court); <u>see</u> <u>also</u> <u>Thomas v. Fry's Electronics, Inc.</u>, 400 F.3d 1206, 1206-07 (9th Cir. 2005) (California anti-SLAPP motions are available to litigants in federal court).

Additionally, the California anti-SLAPP statute, on which the Oregon statute is based, has been invoked against a variety of claims involving protected speech. <u>Ingels v. Westwood One Broad. Servs., Inc.</u>, 28 Cal. Rptr. 3d 933, 940 (Cal. App. 2005) (applying statute to age discrimination claim); <u>Seelig v. Infinity Broad. Corp.</u>, 119 Cal. Rptr. 2d 108 (Cal. App. 2002) (applying statute to claims for intentional infliction of emotional distress, slander, and invasion of privacy); <u>Ludwig v. Superior Court</u>, 43 Cal. Rptr. 2d 350 (Cal. App. 1995) (applying statute to claims for

7 - FINDINGS & RECOMMENDATION

interference with contractual relations, interference with prospective economic advantage, and unfair competition); Exh. 1 to Aug. 8, 2005 Hinkle Declr. (minutes of public hearing on proposed anti-SLAPP statute before 2001 Oregon House Committee on the Judiciary, Subcommittee on Civil Law, in which Legislative Counsel Dave Heynderickx testified that the bill is closely modeled on the California statute).

To succeed on the motion, defendants must first make a prima facie showing that the claims to which the motion is directed arise out of one of the categories of civil actions described in O.R.S. 31.150(2). If defendants meet that burden, the burden shifts to plaintiffs to show, by substantial evidence supporting a prima facie case, that there is a probability that plaintiffs will prevail on their claims.

II. Defendants' Burden

In the motion, defendants do not identify which particular subsection of O.R.S. 31.150(2) they rely on. In their opening memorandum, Martino and Westwood specifically rely on subsection (2)(d) which governs civil actions arising out of "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." O.R.S. 31.150(2)(d). In their reply memorandum, and in response to plaintiffs' argument that the broadcast is not "[a]ny other conduct," but rather is expression not governed by subsection (2)(d), defendants still maintain that the broadcast is "[a]ny other conduct" within the meaning of subsection (2)(d), but they alternatively contend that the broadcast equally arises out of

8 - FINDINGS & RECOMMENDATION

"[a]ny oral statement made . . . in a place open to the public or a public forum in connection with an issue of public interest" as provided in subsection (2)(c).[2] O.R.S. 31.150(2)(c).

I agree with Martino and Westwood that the broadcast is both "[a]ny other conduct" under subsection (2)(d), and is "[a]ny oral statement made . . . in a public forum" under subsection (2)(c). The issue that must be resolved is whether the broadcast was related to a "public issue" or an "issue of public interest."

A.   In Furtherance of a Constitutional Right

Under subsection (2)(d), the conduct must be in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech.  Although there are no Oregon cases on point, there are at least two California cases applying the analogous California statute to on-air radio broadcasts. Ingels, 28 Cal. Rptr. 3d 933 (conversation on a radio talk show); Seelig, 119 Cal. Rptr. 2d 108 (same).  Plaintiffs do not appear to seriously contend that Martino and Westwood were not exercising their constitutional free speech rights.[3]

Plaintiffs do make this argument as to Clear Channel. However, the statute does not require that the constitutional right of free speech at issue actually belong to the moving defendant. The statute provides that the motion may be made against any claim in a civil action arising out of "[a]ny other conduct in

---

[2]  The argument that the actions are not "[a]ny other conduct" governed by subsection (2)(d) is not directed at Clear Channel's act of rebroadcasting the original broadcast on KEX.

[3]  Moreover, no such requirement exists under subsection (2)(c).

9 - FINDINGS & RECOMMENDATION

furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." O.R.S. 31.150(2)(d). I need not discuss whether Clear Channel was exercising its own free speech rights because it is sufficient under subsection (2)(d) that its conduct was in furtherance of Martino's and Westwood's free speech rights. It is clear that Clear Channel's rebroadcast on KEX meets that standard.

B.  Public Issue/Issue of Public Interest

Defendants represent that there are no Oregon appellate cases interpreting O.R.S. 31.150. They contend, however, that based on state circuit court cases, and California appellate cases, the concept of "public issue" or "issue of public interest," should be broadly interpreted to include a conversation regarding a consumer transaction on a consumer-oriented talk radio call-in show.

The two Oregon circuit court cases contain no discussion of this particular issue. But, the fact that the judges in those cases applied the statute to the facts before them suggests that the "public issue" and "public interest" terms were broadly interpreted. In one case, the court granted the defendants' anti-SLAPP O.R.S. 31.150 motion directed at claims of libel and false light invasion of privacy based on statements published in an article about the plaintiff's resignation from InFocus Corporation and some of the business decisions the plaintiff made while employed there. Thale v. Business Journal Publ'ns, Mult. Co. No. 0402-02160, Order at p. 1 (May 20, 2004) (copy of Order attached as Exh. 4 to July 8, 2005 Hinkle Declr.).

In the other Oregon circuit court case, the court granted the defendants' anti-SLAPP O.R.S. 31.150 motion directed at claims of

defamation and intentional infliction of emotional distress based on statements the plaintiff's former employer made to other employees and to its shareholders regarding the plaintiff's termination. Kurdock v. Electro Scientific Indus., Inc., Mult. Co. No. 0406-05889, Order at pp. 1-2 (Oct. 15, 2004) (copy of Order attached as Exh. 7 to July 8, 2005 Hinkle Declr.).

Defendants also point to a 2004 decision by Judge Hogan in which he held that a claim for defamation based on statements published in a newspaper and later on an Internet website, to the effect that the plaintiff had made anti-Israel statements in the classroom, was subject to the defendants' anti-SLAPP motion to strike. Card, Order at p. 17 ("[p]laintiff's claims arise out of written statements presented in a place open to the public or public forum (website, newspaper) in connection with an interest of public concern (alleged political activism and bias in the college classroom.").

Although none of these cases are binding on this court, they are the only decisions by an Oregon court, or a federal court interpreting Oregon law, regarding the application of O.R.S. 31.150. Given that these courts have applied Oregon's statute to situations involving private companies, and in the case of Kurdock, to internal employee or shareholder communications, and to newspaper and Internet publications regarding statements made in a classroom, I agree with defendants that these courts have generally given Oregon's "public issue" or "public interest" concept a broad interpretation.

Just as persuasive are the California decisions, interpreting California's analogous anti-SLAPP statute, which have broadly

interpreted the "public issue" or "public interest" standard. E.g., Traditional Cat Ass'n, Inc. v. Gilbreath, 13 Cal. Rptr. 3d 353, 356 (Cal. App. 2004) (statements concerning a dispute among different factions of cat breeders were matters of public interest for purposes of anti-SLAPP statute because they "concerned matters of public interest in the cat breeding community"); Seelig, 119 Cal. Rptr. 2d at 115 (discussion on radio talk show regarding participant on television program called "Who Wants to Marry a Multimillionaire" was subject to anti-SLAPP statute because the subject of the radio discussion, a television show featuring "the sort of person willing to meet and marry a complete stranger on national television," fell within the statutory criterion of "an issue of public interest").

Finally, most persuasive are the cases holding that statements about the quality of consumers goods and services are matters of public interest. In a 2004 case, the California Court of Appeal remarked, in the context of discussing the "public interest" standard in California's anti-SLAPP statute:

> Consumer information, however, at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest. Paradise Hills Associates v. Procel (1991) 235 Cal. App. 3d 1528, 1 Cal. Rptr;. 2d 514, although not itself [an anti-SLAPP] case, noted that the First Amendment protected a consumer's statements about the quality of a seller's products and service and her unhappiness with them, finding, in part, that the statements concerned a matter of public interest. Courts have recognized the importance of the public's access to consumer information. The growth of consumerism in the United States is a matter of common knowledge. Members of the public have recognized their roles as consumers and through concerted activities, both private and public, have attempted to improve their . . . positions vis-a-vis the supplies [sic] and manufacturers of consumer goods. They clearly have an interest in matters which affect their roles as consumers, and peaceful activities,

12 - FINDINGS & RECOMMENDATION

such as plaintiffs', which inform them about such matters are protected by the First Amendment.

Wilbanks v. Wolk, 17 Cal. Rptr. 3d 497, 506-07 (Cal. App. 2004) (internal quotations and citations omitted); see also DuPont Merck Pharmaceutical Co. v. Superior Court, 92 Cal. Rptr. 2d 755, 759 (Cal. App. 2000) (for purposes of anti-SLAPP motion, statements comparing quality and effectiveness of drug products made "in connection with a public issue"); Melaleuca, Inc. v. Clark, 78 Cal. Rptr. 2d 627, 638 (Cal. App. 1998) (in context of claims for defamation and economic interference, "statements about the contents of [plaintiff's] product were a matter of public concern," and "the public has a well-recognized interest in knowing about the quality and contents of consumer goods").

In response to the cases cited by defendants, plaintiffs cite a single California case holding that the specific dispute at issue involving a hospital's disciplinary actions against a surgeon allegedly in retaliation for protesting a perceived interference with a medical decision, was too attenuated from the general topics of quality health care and managed care systems to trigger anti-SLAPP protection. O'Meara v. Palomar-Pomerado Health Sys., 23 Cal. Rptr. 3d 406, 415 (Cal. App. 2005), rev. granted and opinion superseded, 110 P.3d 1216, 28 Cal. Rptr. 3d 2 (Cal. 2005).

Plaintiffs argue that following O'Meara, I should not construe the "public interest" or "public issue" concept to include a single purely private transaction between Feroglia and Mt. Hood Polaris under the guise of the broader issue of "consumer protection." However, even if I were inclined to follow O'Meara, which I am not in this consumer protection/complaint context, plaintiff's citation

13 - FINDINGS & RECOMMENDATION

to the case is inappropriate under applicable California Rules of Court. Cal. Rules of Court, Rules 976(d), 977(a) (once the California Supreme Court grants review of a California Court of Appeal decision, that lower decision is no longer considered published, and if the decision is not published, it cannot be cited by the court or a party in any other action). Moreover, as defendants note, a different division of the California Court of Appeals has expressly rejected O'Meara's reading of "issue of public interest." Kilber v. North Inyo County Local Hosp. Dist., 24 Cal. Rptr. 3d 220, 226 (Cal. App. 2005), rev. granted and opinion superseded, 110 P.3d 1216, 28 Cal. Rptr. 3d 1 Cal. 2005). It is reasonable to assume that the California Supreme Court intends to resolve the conflict created by these two decisions.

Given that the majority of the authority cited by the parties, and all of the authority I may properly consider, adopts a broad interpretation of "public issue" or "public interest," and notably, given the cases holding that issues of consumerism, including complaints about products and services, are issues of public interest, I conclude that the statements made here about plaintiffs and their alleged treatment of Feroglia and the quality of the product, are properly considered statements about a public issue or an issue of public concern within the meaning of Oregon's anti-SLAPP statute.

C. Timeliness of Clear Channel's Motion

The final issue to address regarding defendants' initial burden is the timeliness of Clear Channel's motion. The original Complaint in this case was filed in Clackamas County Circuit Court on April 4, 2005. Clear Channel was served on May 1, 2005, Martino

14 - FINDINGS & RECOMMENDATION

was served on or after May 8, 2005, and Westwood was served on May 23, 2005.  Defendants removed the case to this court on May 27, 2005.

The statute requires an anti-SLAPP special motion to strike to be filed "within 60 days after the service of the complaint or, in the court's discretion at any later time."  O.R.S. 31.152.

The anti-SLAPP motion filed on July 8, 2005 was clearly within the sixty days allowed for the filing of such a motion by O.R.S. 31.152, as to defendant Westwood because it was served on May 23, 2005.  And, although sixty days after a May 8, 2005 service on Martino is July 7, 2005 (since May has thirty-one days), plaintiffs raise no issue as to the timeliness of the motion by Martino because the parties stipulated to a July 8, 2005 date for defendants to respond to the Complaint (docket #6).

The July 8, 2005 motion was filed on behalf of Martino and Westwood.  Also on July 8, 2005, plaintiffs filed an Amended Complaint.  On July 18, 2005, Clear Channel separately filed a "Joinder in Special Motion to Strike" in which Clear Channel states that pursuant to O.R.S. 31.150, it moves to strike plaintiffs' claims against it and joins in the legal memorandum and declarations filed by Martino and Westwood One.

Plaintiffs argue that Clear Channel's July 18, 2005 joinder is untimely because it exceeds the sixty days allowed by O.R.S. 31.152 for filing the motion given that Clear Channel was served with the Complaint on May 1, 2005.  I reject plaintiffs' contention.

First, although the statute does not expressly state that the sixty days runs run from the service of the complaint, or amended complaint, it cannot logically be read any other way.  Notably, the

15 - FINDINGS & RECOMMENDATION

statute does not expressly require that the motion be filed within sixty days of service of the original complaint and it does not state that the motion must be filed within sixty days of service of process or service of summons and the complaint. Moreover, common sense requires that the sixty days be counted from the service of an amended complaint because otherwise, a party could be served with a complaint raising no issues implicating O.R.S. 31.150 and sixty-one days thereafter, the plaintiff could serve an amended complaint implicating O.R.S. 31.150. Under plaintiffs' reading of the statute, a defendant faced with such an amended pleading could not file an anti-SLAPP motion to strike. The only reasonable interpretation of the statute is to construe it as meaning sixty days after service of the complaint or any amended complaint. Under such a reading, the joinder by Clear Channel in the motion to strike is timely because it was only ten days after the Amended Complaint was filed.

Second, the statute itself allows the court discretion to adjust the date. Here, plaintiffs do not challenge the timeliness of the motion by two of the three defendants. It makes no sense to consider the motion as to only some of the defendants when the statements giving rise to the claims which fall within O.R.S. 31.150(2)(c) or (d) are the same for all defendants, and when the arguments made on the merits of the motion are the same for all defendants. Thus, even if the statute were construed to require the motion to be filed within sixty days of service of the original complaint only, I exercise my discretion to allow Clear Channel to file its motion.

I recommend concluding that all defendants have met their

16 - FINDINGS & RECOMMENDATION

initial burden under O.R.S. 31.150.

III.  Plaintiffs' Burden

Once defendants have met their initial burden, the burden shifts to plaintiffs to establish that there is a probability that they will prevail on their claims by presenting substantial evidence to support a prima facie case.  O.R.S. 31.150(3).  "[T]he plaintiff cannot simply rely on the allegations in the complaint . . . but must provide the court with sufficient evidence to permit the court to determine whether there is a probability that the plaintiff will prevail on the claim."  ComputerXpress, Inc. v. Jackson, 113 Cal. Rptr. 2d 625, 641 (Cal. App. 2001) (citation and internal quotation omitted).

A.  Defamation Claim

Defendants contend that plaintiffs cannot sustain their burden of establishing a prima facie case on the defamation claim because Martino's statements are nonactionable opinion.  For the reasons explained below, I agree with defendants.

Generally, under Oregon law, statements which are expressions of opinion are not actionable.  Reesman v. Highfill, 327 Or. 597, 605, 965 P.2d 1030, 1035 (1998); see also King v. Menolascino, 276 Or. 501, 504, 555 P.2d 442, 443 (1976) (opinion expressed in letter to editor not capable of defamatory meaning); Haas v. Painter, 62 Or. App. 719, 725, 662 P.2d 768, 771 (1983) (same, with respect to opinions expressed in newspaper editorial).

A statement of opinion can be actionable, however, if the recipients of the statement could reasonably have concluded that the statement was based on undisclosed defamatory facts.  Slover v. Oregon St. Bd. of Clinical Social Workers, 144 Or. App. 565, 568,

17 - FINDINGS & RECOMMENDATION

927 P.2d 1098, 1100 (1996). Whether a statement is a statement of opinion or one of fact is a question of law. <u>Id.</u>

The Oregon cases are not entirely clear about whether the basis for protecting opinion from liability is grounded in the jurisprudence of Oregon common law or in the First Amendment. For example, the Oregon Court of Appeals has stated that statements of mere opinion are constitutionally protected when they do not imply the existence of underlying defamatory facts. <u>Roop v. Parker Northwest Paving Co.</u>, 194 Or. App. 219, 244, 94 P.3d 885, 899 (2004), <u>rev. denied</u>, 338 Or. 374, 110 P.3d 113 (2005); <u>see</u> <u>also</u> <u>Hickey v. Settlemier</u>, 141 Or. App. 103, 110, 917 P.2d 44, 48 (1996) (citing both First Amendment and Oregon cases, as well as the Restatement (Second) of Torts, § 566, for the proposition that opinions, as statements that cannot reasonably be interpreted as stating actual facts, are constitutionally protected, unless they imply undisclosed defamatory facts).

Other Oregon cases articulating the same principle that opinion is nonactionable, refer only to other Oregon cases or to the Restatement, without noting a constitutional basis. <u>E.g.</u>, <u>Affolter v. Baugh Constr. Or., Inc.</u>, 183 Or. App. 198, 203, 51 P.3d 642, 644 (2002) (citing <u>Bock v. Zittenfield</u>, 66 Or. App. 97, 102, 672, 1237, 1240 (1984) (citing Restatement (Second) of Torts, § 566)).

In the end, it makes no difference whether the issue is analyzed as one of Oregon common law or as one of First Amendment law. Both require the court to examine the statements in the context they were made and not in isolation. Both hold that if the opinion is made together with disclosed facts, it is not

18 - FINDINGS & RECOMMENDATION

actionable.

In determining whether a communication is capable of a having a defamatory meaning, "the court must look to the general purport and intent of the article published and not to isolated sentences[.]" <u>Kilgore v. Koen</u>, 133 Or. 1, 10, 288 P. 192, 195 (1930). "We are to read the article as a whole in order to determine the sense in which particular words were used." <u>Marr v. Putnam</u>, 196 Or. 1, 26, 246 P.2d 509, 520 (1952).

Similarly, under the relevant First Amendment analysis, the court examines the totality of circumstances in which the alleged statement was made. <u>Underwager v. Channel 9 Australia</u>, 69 F.3d 361, 366 (9th Cir. 1995) ("[t]o determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made.").

As explained in <u>Underwager</u>, the court looks "at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." <u>Id.</u> The court also examines "the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." <u>Id.</u>

Defendants cite to several cases indicating that the nature of the medium in which the allegedly defamatory statements appear is relevant to the inquiry. <u>E.g.</u>, <u>Knieval v. ESPN</u>, 393 F.3d 1068, 1077 (9th Cir. 2005) (noting that viewers of a website intended for a youthful audience would expect to find youthful, figurative slang and language); <u>Partington v. Bugliosi</u>, 56 F.3d 1147, 1154 (9th Cir. 1995) (noting that readers of a lawyer's book about his own

19 - FINDINGS & RECOMMENDATION

accomplishments would expect to find "the highly subjective opinions of the author rather than assertions of verifiable, objective facts.").

While I acknowledge this precedent and agree that context is relevant, I do not read these cases to suggest that the medium is outcome determinative. That is, while listeners of talk radio may expect a certain amount of ranting and opinionated rhetoric, that does not insulate all statements made on talk radio from liability for defamation. I do not read the cases as going that far.

I agree with defendants that the average person would understand that a fair amount of opinion is likely to be expressed on a talk radio show, and that some of it would be hyperbolic, exaggerated, and self-serving. I am less certain that the average listener of a consumer-oriented problem-solving show would have the same expectation. Nonetheless, when I look at the specific context of this exchange between Feroglia and Martino, I am convinced that Martino's "lying" statements would be understood as his opinion and not as implying an undisclosed factual assertion.

The majority of the conversation between Feroglia and Martino was Feroglia reciting facts to Martino. Martino's challenged statements were made in the context of Feroglia reciting a history of problems with the PWC and her alleged inability to get it repaired or get her money back from plaintiffs. Given the facts recited by Feroglia before Martino made the challenged statements, Martino could have been referring to any one of three potential lies: (1) a lie by plaintiffs when they allegedly said they would buy the PWC back; (2) a lie by plaintiffs when they denied saying they would buy the PWC back; and (3) a lie by plaintiffs when they

said they had tested the PWC and it "worked great."

In the course of his discussion with Feroglia, Martino also used "colorful" slang when he stated that "Mt. Hood Polaris, Polaris Industries equals Polaris sucks. Here's your equation. Polaris Industries plus Mt. Hood Polaris equals sucks. Why? Because she has nowhere to go. Ping, pong. . . . Polaris Industries and Mt. Hood Polaris. These people truly suck." App. at pp. 5-6.

In reviewing the entire conversation, including this language at the end, and recognizing that this is a show designed to solicit consumer complaints and in which listeners would likely expect the host to express his opinion, the audience would likely recognize that Martino's statements did not represent provable assertions.

As plaintiffs note, stating that someone is a liar can certainly imply a knowledge of underlying facts. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."). However, "when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." Partington, 56 F.3d at 1156. That is, if the bases for the speaker's opinion are fully disclosed, "no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances." Id. (internal quotation omitted).

When the factual basis for an opinion is recited, "the readers understand that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts,

21 - FINDINGS & RECOMMENDATION

this type of statement is not actionable in defamation." _Id._ (internal quotation omitted). As the court in _Partington_ explained, when facts are available to both the reader and the writer, statements maligning a person based on those facts "are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader." _Id._

Given that the statements came after a long recitation of facts disclosed by Feroglia, I conclude, as a matter of law, that they are nonactionable opinion under both the First Amendment and Oregon common law. Thus, I recommend that defendants' motion as to the defamation claim be granted.

B. False Light Invasion of Privacy Claim

In the Amended Complaint, all three plaintiffs bring this claim against all defendants. Defendants contend that the claim fails for the same reason as the defamation claim. Alternatively, defendants argue that the false light claim should be stricken in its entirety because plaintiffs cannot show malice, should be stricken as to Mt. Hood Polaris because a corporation has no right to privacy, and should be stricken as to Susan Gardner because none of the statements in the broadcast concerned her.

Because I agree with defendants that the false light claim fails on First Amendment grounds, I do not address the alternative arguments. However, plaintiffs concede that Mt. Hood Polaris has no false light claim and Mt. Hood Polaris withdraws that claim. Pltf's Mem. at p. 35.

In _Dean v. Guard Publ'g Co., Inc._, the Oregon Court of Appeals recognized the tort of false light invasion of privacy. 73 Or.

App. 656, 659, 699 P.2d 1158, 1160 (1985); but see Reesman, 327 Or. at 607 & n.3, 965 P.2d at 1036 & n.3 (expressly declining to decide whether to recognize the tort, but acknowledging that the Oregon Court of Appeals has done so).

The same First Amendment defenses that apply to defamation cases also apply to false light claims. Time, Inc. v. Hill, 385 U.S. 374, 387-88 (1967) (applying First Amendment protections to claims brought under New York right of privacy statute); see also Cort v. St. Paul Fire & Marine Ins. Cos., Inc., 311 F.3d 979, 987 (9th Cir. 2002) ("When an invasion of privacy claim rests on the same allegations as a claim for defamation, the former cannot be maintained as a separate claim if the latter fails as a matter of law.") (internal quotation, citation, and ellipsis omitted); Partington, 56 F.3d at 1160 (rejecting false light claims as to certain contested statements "for the same reason that we rejected his defamation claims based on those statements: both statements are protected by the First Amendment, regardless of the form of tort alleged."); Brennan v. Kadner, 814 N.E.2d 951, 959 (Ill. App. 2004) (statement of nonactionable opinion protected by First Amendment in context of false light invasion of privacy claim); Town of Sewall's Point v. Rhodes, 852 So. 2d 949, 950-51 (Fla. App. 2003) (statements of opinion protected by First Amendment and not actionable as defamation or as basis for invasion of privacy claim).

Based on the discussion above in connection with the defamation claim, the challenged statements, as nonactionable opinion, may not provide the basis for a false light invasion of privacy claim. Thus, I recommend that defendants' motion as to

23 - FINDINGS & RECOMMENDATION

this claim be granted.

C.  Intentional   Interference   with   Economic
Relations and Intentional Interference with
Prospective Economic Advantage Claims

In these claims, brought only by plaintiff Mt. Hood Polaris
and only against defendant Martino, Mt. Hood Polaris alleges that
Martino intentionally interfered with Mt. Hood Polaris's existing
relationships with customers and with prospective customers.  Am.
Compl. at ¶¶ 34-37, 38-40.

Both of these torts require proof of the following:

(1)  the  existence  of  a  professional  or  business
relationship (which could include, _e.g._, a contract or a
prospective   economic   advantage);   (2)   intentional
interference with that relationship or advantage; (3) by
a third party; (4) accomplished through improper means or
for an improper purpose; (5) a causal effect between the
interference  and  the  harm  to  the  relationship  or  the
prospective advantage; and (6) damages.

Allen v. Hall, 328 Or. 276, 281, 974 P.2d 199, 202 (1999).

Plaintiffs    contend    that    Martino's    alleged    intentional
interference was through improper means.  Amended Compl. at ¶¶ 36,
39.  The improper means are the challenged statements regarding
plaintiffs' alleged lying.  Id.  There is no allegation of an
improper purpose.

Defendants argue that because the challenged statements are
protected by the First Amendment, they cannot furnish the basis for
an "improper means" allegation.  Defendants suggest that there is
nothing improper, as a matter of law, about making statements that
are protected by the common law and by the First Amendment.

Ninth Circuit law supports defendants' argument.  Unelko Corp.
v. Rooney, 912 F.2d 1049, 1058 (9th Cir. 1990) (when a claim of
tortious interference with business relationships is brought as a

24 - FINDINGS & RECOMMENDATION

result of constitutionally protected speech, the claim is "subject to the same first amendment requirements that govern actions for defamation"); see also Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655, 39 F.3d 191, 196 (8th Cir. 1994) (the constitutional requirements for defamation "must equally be met for a tortious interference claim based on the same conduct or statements"; otherwise "a plaintiff may ... avoid the protection afforded by the Constitution ... merely by the use of creative pleading."); Redco Corp. v. CBS, Inc., 758 F.2d 970, 973 (3d Cir. 1985) (unless defendants "can be found liable for defamation, the intentional interference with contractual relations count is not actionable").

Based on the cited cases, I recommend that defendants' motion directed at both intentional interference claims, be granted.

CONCLUSION

I recommend that defendants' special motion to strike (#9) be granted.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due October 4, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

/ / /

/ / /

/ / /

/ / /

/ / /

If objections are filed, a response to the objections is due

25 - FINDINGS & RECOMMENDATION

October 18, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this __19th__ day of __September__ , 2005.


_____

/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

26 - FINDINGS & RECOMMENDATION